*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BERNARD F. SCHULTZ; ELIZABETH M. SABATINE,
　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

UNITED STATES OF AMERICA,
　　　　　　　　　　*Defendant-Appellee.*

No. 07-5618

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 07-00012—R. Allan Edgar, District Judge.

Argued: March 17, 2008

Decided and Filed: June 2, 2008

Before: RYAN, SILER, and COLE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Thomas E. Ray, SAMPLES, JENNINGS, RAY & CLEM, Chattanooga, Tennessee, for Appellants. Lewis Yelin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Thomas E. Ray, SAMPLES, JENNINGS, RAY & CLEM, Chattanooga, Tennessee, for Appellants. Lewis Yelin, William Kanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. George W. Kuney, UNIVERSITY OF TENNESSEE COLLEGE OF LAW, Knoxville, Tennessee, for Amicus Curiae.

---

## OPINION

---

　　　R. GUY COLE, JR., Circuit Judge. Plaintiffs-Appellants Bernard Francis Schultz and Elizabeth Mary Sabatine (hereinafter "the Schultzes"), husband and wife and residents of Hamilton County, Tennessee, filed for bankruptcy under Chapter 13 in the United States Bankruptcy Court for the Eastern District of Tennessee. Independently, the Schultzes filed a complaint for declaratory judgment in the United States District Court for the Eastern District of Tennessee, alleging that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA" or "the Act") violates Article I, Section 8, Clause 4 of the Constitution (the "Bankruptcy Clause"), which gives Congress the power to establish "*uniform* Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. 1, § 8, cl. 4 (emphasis added). The district court granted the Government's motion for summary judgment and dismissed the Schultzes' complaint. For the following reasons, we **AFFIRM** the judgment of the district court.

1

# I.  BACKGROUND

## A.

Individual consumer debtors generally choose between two forms of relief afforded by the Bankruptcy Code: Chapter 7 and Chapter 13.[1]  In a Chapter 7 proceeding, an individual debtor receives an immediate unconditional discharge of personal liabilities for debts in exchange for the liquidation of all non-exempt assets.  *See* 11 U.S.C. §§ 701-784.  By contrast, in a Chapter 13 proceeding, a debtor commits to repayment of a portion of his or her financial obligations over a specified period of time (generally three to five years) in exchange for retaining non-exempt assets and receiving a broader discharge of debt than is available under Chapter 7.  *See* 11 U.S.C. §§ 1301-1330.  Under the bankruptcy system prior to the BAPCPA, Pub. L. No. 109-8, 119 Stat. 23 (codified as amended in scattered sections of Title 11 of the United States Code), debtors had a presumption of eligibility to file under Chapter 7, with the final determination made by the Bankruptcy Court on an individualized basis.  11 U.S.C. § 727.

In 2005, the landscape for bankruptcy filings dramatically changed.  Responding to a growing belief that "bankruptcy relief may be too readily available and is sometimes used as a first resort, rather than a last resort," H.R. REP. NO. 109-31(I), at 4 (2005), and the prevalence of "opportunistic personal filings and abuse," *id.* at 5, Congress enacted the BAPCPA in order to require above-median income debtors to make more funds available for the payment of unsecured creditors.  As a result, higher-income debtors with the ability to repay a substantial portion of their debts without significant hardship are now required to do so by filing under Chapter 13 rather than Chapter 7.

The centerpiece of the Act is the imposition of a "means test" for Chapter 7 filers, which requires would-be debtors to demonstrate financial eligibility to avoid the presumption that their bankruptcy filing is an abuse of the bankruptcy proceedings.  By its terms, the BAPCPA authorizes a bankruptcy court to dismiss a debtor's petition filed under Chapter 7 or, with the debtor's consent, to convert such a petition to Chapter 13 "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]."  11 U.S.C. § 707(b)(1).  Under this test, the first step instructs the bankruptcy court to compare the debtor's annualized current monthly income to the median family income of a similarly sized family in the debtor's state of residence.  If the debtor's current monthly income is equal to or below the median, then the presumption of abuse does not arise.  11 U.S.C. § 707(b)(7).  If, however, it exceeds the median, the Act directs the court to recalculate the debtor's income by deducting certain necessary expenses specified by the statute.  *Id.* § 707(b)(2)(A)(ii).  These reductions are derived from the national and local standards contained in the Internal Revenue Service's Financial Analysis Handbook.  *Id.*; *see* INTERNAL REVENUE SERV., INTERNAL REVENUE MANUAL, FINANCIAL ANALYSIS HANDBOOK ("IRS Handbook"), *available at* http://www.irs.gov/irm/part5/ch15s01.html.

Because of these deductions, eligibility under the new regime is calculated at least in part based on the state and county where the debtor resides.  The housing expense deduction, for example, is governed by the county where the debtor resides.  *Id.* § 5.15.1.7(4)(A).[2]  Although the national standards, which identify amounts for "food, housekeeping supplies, apparel and services,

---

[1] While individual consumer debtors also may file under Chapter 11 of the Bankruptcy Code, *see Toibb v. Radloff*, 501 U.S. 157, 160-64 (1991), as a practical matter, the cost and complexity of this remedy preclude most individual debtors from doing so.

[2] The BAPCPA also permits a debtor to deduct additional expenses for food, clothing, housing, utilities, health insurance, disability insurance, health savings accounts, and certain educational expenses, so as long as the debtor demonstrates that those additional allowances are reasonable and necessary.  11 U.S.C. § 707(b)(2)(A)(ii).

and personal care products and services," and a fixed "miscellaneous" amount, *id.* § 5.15.1.7(3), are mostly uniform throughout the United States, the local standards, which define amounts for housing and transportation, vary greatly.

If after deducting these necessary expenses and specified amounts, the debtor's current monthly income exceeds certain mathematical benchmarks, then the presumption of abuse arises. 11 U.S.C. § 707(b)(2)(A)(i). This presumption may be rebutted only if the debtor demonstrates special circumstances justifying any additional expenses or adjustments to the debtor's income for which there is no reasonable alternative, and that those special circumstances reduce the debtor's income below the specified benchmarks. *Id.* § 707(b)(2)(B). And even if the presumption of abuse does not apply, or has been rebutted by the debtor, the BAPCPA empowers a bankruptcy court to consider whether it believes "the debtor filed the petition in bad faith," or whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." *Id.* § 707(b)(3).

To implement and enforce these reforms, the United States trustee or the bankruptcy administrator reviews a Chapter 7 debtor's petition and files with the court a statement explaining whether a presumption of abuse arises. *Id.* § 704(b)(1). If the trustee determines that it does, then the trustee is directed either to file a motion to dismiss, a motion to convert the petition, or to provide a statement explaining why such a motion is inappropriate. *Id.* § 704(b)(2).

The BAPCPA also amended two aspects of Chapter 13. First, "disposable income" is now defined as "currently monthly income received by the debtor . . . less amounts reasonably needed to be expended." 11 U.S.C. § 1325(b)(2). If a debtor's annualized monthly income exceeds the median family income for a similarly sized family in the applicable state, the Act requires the bankruptcy court to calculate "amounts reasonably necessary to be expended" in accordance with the same IRS Handbook's national and local standards used in Chapter 7. *Id.* § 1325(b)(3). If a debtor is below the median income, the "amounts reasonably necessary to be expended" are instead determined as they were pre-BAPCPA—by the bankruptcy court assessing whether the expenses listed by the debtor in Schedule J (which must be filed along with the bankruptcy petition) are reasonably necessary for the debtor's maintenance and support. *Id.* § 1325(b)(2). Second, if the debtor's income still exceeds the median after recalculation, the Act imposes an "applicable commitment period" of "not less than 5 years." *Id.* § 1325(b)(4)(A)(ii). However, if the debtor's annualized income is less than the median, then the applicable commitment period is three years. *Id.* § 1325(b)(4)(A)(i).

## B.

On November 21, 2006, the Schultzes filed for bankruptcy under Chapter 13 in the United States Bankruptcy Court for the Eastern District of Tennessee. On January 13, 2007, the bankruptcy court confirmed their plan, which required payment for sixty months and resulted in a pro-rata distribution to unsecured creditors of less than 100% of their allowed claims.

Concurrently, the Schultzes brought a separate suit against the United States, which challenges the five sections of the BAPCPA that employ the "means test"—Sections 707(b)(7), 707(b)(2), 704(b), 1325(b)(3), and 1325(b)(4)—under one central theory: because median-income calculations are based, at least in part, on the state and county in which the debtor resides, the BAPCPA is not a "*uniform* Law[] on the subject of Bankruptcies throughout the United States." U.S. CONST. art. 1, § 8, cl. 4 (emphasis added).

At the time of their Chapter 13 filing, the Schultzes had an annualized current monthly income of $84,975.84, an amount that is above the median family income for a family of five for Tennessee residents (which is $63,174), but below the median family income of Connecticut,

Hawaii, Massachusetts, Maryland, New Hampshire, and New Jersey.[3] As a result of this benchmark in Tennessee, the Schultzes' applicable commitment period was five, rather than three, years, and in calculating their disposable income they were limited to the expense deductions set forth in Sections 707(b)(2)(A) and (B).  11 U.S.C. § 1325(b)(3)-(4).

After the parties filed cross-motions for summary judgment, the district court granted the Government's motion and dismissed the Schultzes' complaint.  Canvassing relevant Supreme Court precedent, the district court concluded that the "uniformity requirement does not proscribe different results in different states because of state law variations."  *Schultz v. United States*, 369 B.R. 349, 352 (E.D. Tenn. 2007).   In response to the Schultzes' argument that the BAPCPA amendments are unconstitutional because they create variations in different states based on federal instead of state law, the district court explained that there is "no principled reason for concluding that variations resulting from federal statistics create unconstitutional non-uniformity, whereas variations resulting from state law do not."  *Id.*  The court concluded that "[d]isposable income might vary from place to place, but it is based on uniformly calculated national statistics.  The variations in the results produced by these statistics are of no constitutional consequence."  *Id.* at 353.

The Schultzes timely appealed.  We review de novo a district court's grant of summary judgment.  *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006).

## II.  ANALYSIS

### A.

As a threshold matter, we address briefly the Government's contention that the Schultzes lack standing to challenge two BAPCPA provisions affecting Chapter 7 bankruptcy filings: Sections 707(b)(2) and 704(b).  We review de novo the question of standing, *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004), even "where standing has erroneously been assumed below," *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001).[4]  A plaintiff has Article III standing when he or she can show: (1) an injury-in-fact that (2) was "fairly traceable to the defendant's allegedly unlawful conduct" and (3) is "likely to be redressed" via a favorable decision.  *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The only question in dispute is whether the Schultzes have shown an "injury-in-fact," or "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent," *Lujan*, 504 U.S. at 560 (citations omitted), by the two presumption-of-abuse sections intended for Chapter 7 debtors.  In applying the first requirement of a concrete injury, the Supreme Court made clear that a plaintiff is not entitled to injunctive or declaratory relief "[a]bsent a sufficient likelihood that he will again be wronged in a similar way," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), unless the plaintiff is subject to "continuing, present adverse effects," *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

The problem, as the Government sees it, is that the Schultzes never filed a Chapter 7 bankruptcy petition, nor do they intend to do so in the future.  Although the Schultzes have shown that their income is above the applicable median family income for Tennessee, *potentially* subjecting them to the challenged Chapter 7 provisions, they have not established that they would be exposed to the presumption of abuse after their monthly income is reduced by allowable expenses specified

---

[3] Across the United States, the median family income for a family of five ranges from $52,036 in Mississippi to $98,505 in Connecticut. (Joint Appendix ("JA") 73-74.)

[4] The Government did not raise the standing issue at the district court, *Schultz*, 369 B.R. at 351 n.1, but "[s]tanding is not an affirmative defense that must be raised at risk of forfeiture." *Cmty. First Bank v. Nat'l Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994).

by the statute.  *See* 11 U.S.C. § 707(b)(2).  The Schultzes, in turn, argue that the potential for being subject to the presumption of abuse under Chapter 7 forced them into filing under Chapter 13.  And requiring a debtor to file a Chapter 7 petition with full knowledge that it would be dismissed subjects the debtor to years of litigation while his bankruptcy case, and financial situation, remain in limbo.

The questions of whether the Schultzes were deterred from filing a Chapter 7 petition, and whether the presumption of abuse would have applied after the appropriate reductions and calculations, are irrelevant for one simple reason:  the parties concede that the Schultzes have standing to challenge the Chapter 13 provisions—Sections 1325(b)(3) and (4)—which use the same state-specific median income levels and varying local standards as the Chapter 7 amendments. Based on their median family income calculation in Tennessee, the Schultzes are currently repaying debt under a sixty-month Chapter 13 plan, and receive less favorable treatment in their plan than individuals in other states.  Moreover, their housing and transportation expenses were determined by reference to the IRS Handbook, which varies by locality.

Because our resolution of the Schultzes' Chapter 13 challenges effectively addresses the identical claims for the Chapter 7 provisions, without regard to whether they have standing to challenge those provisions, we find no need to resolve this issue.  To put it simply, we could not invalidate some of the "means test" provisions without invalidating the others.

**B.**

**1.**

We turn to the central issue in this case: Is the BAPCPA a uniform law on the subject of bankruptcy?  The Bankruptcy Clause of the Constitution grants Congress the power to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. CONST. art. I, § 8, cl. 4.  What distinguishes these "peculiar terms" from the other Article I powers is the concept of uniformity, which, as Chief Justice Marshall noted nearly two centuries ago, "deserve[s] notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but instead to establish uniform laws on the subject throughout the United States."  *Sturges v. Crowinshield*, 17 U.S. (4 Wheat.) 122, 193-94 (1819).

Echoing Justice Marshall's concern that the concept of "uniformity is, perhaps, incompatible with state legislation," *id.*, the Schultzes contend that "the classification scheme adopted by Congress based upon whether a debtor is above or below the median income of his particular state of residence violates the Bankruptcy Clause because it results in some debtors receiving different bankruptcy relief under federal law based solely upon [the] state or county [in which] they happen to reside."  (Appellants' Br. 8-9.)  Implicit in their argument is what the Supreme Court has referred to as personal uniformity, or the notion that the bankruptcy laws should apply identically to individual debtors, regardless of the state or locality in which the debtor resides.  The Court, however, has consistently described the Bankruptcy Clause's uniformity requirement as "geographical, and not personal," *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902), which is "wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country regardless of the State in which the bankruptcy court sits," *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172 (1946) (Frankfurter, J., concurring).

Over the last century, the Supreme Court has wrestled with the notion of geographic uniformity, ultimately concluding that it allows different effects in various states due to dissimilarities in state law, so long as the federal law applies uniformly among classes of debtors. In *Moyses*, one of the first cases dealing with the validity of a bankruptcy statute, the Court upheld the incorporation of varying state exemptions into the 1898 Bankruptcy Act.  186 U.S. at 189-90.

Geographic uniformity in this context, the Court observed, was satisfied "when the trustee takes in each state whatever would have been available if the bankrupt law had not been passed. The general operation of the law is uniform although it may result in certain particulars differently in different states." *Id.* at 190. In 1918, the Court reaffirmed the *Moyses* principle in a case involving the Bankruptcy Act's incorporation of varying state fraudulent conveyance statutes, despite the fact that the laws "may lead to different results in different states." *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918). *See also Vanston*, 329 U.S. at 172 (explaining that the Bankruptcy Clause "does not mean wiping out the differences among the forty-eight States" and holding that state tort and contract law may determine the validity of creditors' claims).

Nearly sixty years later, the Supreme Court, applying *Moyses*, held that Congress may enact non-uniform laws to deal with geographically isolated problems as long as the law operates uniformly upon a given class of creditors and debtors. *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102 (1974). In *Blanchette*, the Court considered the constitutionality of the Regional Rail Reorganization Act ("Rail Act"), which operated only in a single statutorily defined region: the northeast United States. In explaining why such a specific statute did not exceed Congress's power under Article I, the Court noted that at the time Congress passed the Rail Act, all of the railroads then operating under the bankruptcy laws were contained within the northeast region, and thus, even had the statute been drafted to be of general applicability, its operation and effect would have been unchanged. *Id.* at 159-60. The Court ultimately concluded that the "uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems," *id.* at 159, so long as the law "appl[ied] equally to all creditors and debtors," *id.* at 160. *See also Leidigh Carriage Co. v. Stengel*, 95 F. 637, 646 (6th Cir. 1899) (holding that the Bankruptcy Clause "imposes no limitation upon congress as to the classification of persons who are to be affected by such laws, provided only the laws shall have uniform operation").

Only once has the Court struck down a statute as non-uniform. In *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 470-71 (1982), the Court determined that Congress overstepped its authority in passing a private bankruptcy law that affected only the employees of a single company, the Rock Island & Pacific Railroad Company. While acknowledging that "the uniformity requirement is not a straightjacket that forbids Congress to distinguish among classes of debtors," *id.* at 469, the Court found that the Act "[was] a response to the problems caused by the bankruptcy of *one* railroad" and was therefore "nothing more than a private bill," *id.* at 470-71. The Court documented the chaos created by discriminatory state legislation during the Articles of Confederation, and concluded that the "uniformity requirement was drafted in order to prohibit Congress from enacting private bankruptcy laws." *Id.* at 472. The lesson, in short, is that "[t]o survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." *Id.* at 473.

Applying these principles to the instant case, we conclude that the BAPCPA is a constitutionally uniform law. Congress is allowed to distinguish among classes of debtors, and to treat categories of debtors differently, whether it be through the incorporation of varying state laws "affecting dower, exemptions, the validity of mortgages, priorities of payment and the like." *Stellwagen*, 245 U.S. at 613. And this is precisely what the BAPCPA does: Sections 707(b)(7), 1325(b)(3), and 1325(b)(4) distinguish between two classes of debtors, those whose annualized current monthly income is above the family median income for the applicable state and those whose income is below. *All* Chapter 13 below-median-income debtors have only a three-year instead of a five-year applicable commitment period, and are subject to more favorable treatment in calculating their disposable income than all debtors above the median; *all* above-median-income debtors are subject to an applicable commitment period of "not less than 5 years," and have their income recalculated in accordance with the IRS Handbook's national and local standards. Yes, the Schultzes may receive less favorable treatment simply because they are residents of Tennessee, a

state whose median monthly income is lower than a host of others, but the same could be said of debtors living in states with less favorable state property exemption laws. *See Moyses*, 186 U.S. at 190. Accordingly, "[t]he general operation of the law is uniform although it may result in certain particulars differently in different states." *Moyses*, 186 U.S. at 190.

Had Congress described the "means test" in explicit geographic terms, by enacting legislation exempting residents of certain states without justification, we would be faced with a significantly different case. In *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525 (9th Cir. 1994), for instance, the Ninth Circuit considered whether a statutory amendment extending the deadline for two states to implement an administrative program violated the uniformity provision of the Bankruptcy Clause. The Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, 100 Stat. 3088 (1986), permanently established the United States Trustee Program, an administrative agency responsible for overseeing the administration of bankruptcy cases and private trustees. Congress curiously chose to phase the program in over a two-year period for every state except North Carolina and Alabama, who instead had the option of voting into the Trustee program over an extended period of time. Several years later, in Section 317 of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089 (1990), Congress extended the deadline for North Carolina and Alabama to implement the program to October 1, 2002, without any corresponding explanation for the special treatment. *St. Angelo*, 38 F.3d at 1529.

Finding that the exemption was "not a provision which has different effects . . . due to differences in the laws of these two states," *id.* at 1531, and that "Congress [did not] provide[] [any] indication that the exemption in question was intended to deal with a problem specific to North Carolina and Alabama," *id.*, the Ninth Circuit concluded that the law did "not apply uniformly to a defined class of debtors," *id.* at 1532.

But there are key differences between the BAPCPA and the statute in *St. Angelo.* For one, as we have already noted, the BAPCPA is uniform in form: all debtors whose income is above the median family income are treated alike, as are all debtors whose income falls below. The resulting differences based on the state in which the debtor resides are analytically indistinguishable from the differences resulting from the incorporation of various state laws. For another, whereas in *St. Angelo* there was no indication that Congress intended for the exemption to deal with a problem specific to North Carolina and Alabama, the BAPCPA directly addresses regionally isolated problems. Because debtors in certain parts of the country are likely to pay more for housing than debtors in other parts, Congress believed that the means test—or "needs-based bankruptcy relief"—could gauge varying costs of living, and thus "ensure that debtors repay creditors the maximum they can afford." H.R. REP. NO. 109-31(I), at 2. The Bankruptcy Clause "does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems," *Blanchette*, 419 U.S. at 159, and it is not for us as an appellate court to pass judgment on the wisdom of congressional legislation.

## 2.

The Schultzes next argue that the uniformity requirement was enacted in response to the fear that the national government would use its power over commerce to the disadvantage of particular states. (Appellants' Br. 12-21; Amicus Br. 4-5.) Accordingly, even if a federal bankruptcy law may vary in application from state to state, employing *federal* income standards enables the preferential treatment of debtors in some states over debtors in other states, a form of discriminatory treatment the Framers explicitly prohibited. We do not find their argument or their view of history compelling.

First, Supreme Court precedent lends no support to the federal versus state distinction. *Moyses*, *Stellwagen*, and *Blanchette* cannot be read as standing for anything more than their precise holding: that Congress does not exceed its constitutional powers in enacting a bankruptcy law that permits variations based on state law or to solve geographically isolated problems. Although the Supreme Court has not specifically addressed classifications based on federal law such as those in the BAPCPA, we find no reasoning within the relevant case law explaining why employing federal variations somehow makes a bankruptcy law non-uniform. The lesson of *Moyses* and its progeny—that Congress may permissibly address regional variations—would apply equally to variations based on either state laws or federal statistics.

And *Gibbons* does not counsel a different result. There, the Court struck down a federal bankruptcy law as violative of the uniformity provision on the ground that the Act was a law designed for and applied to only one bankrupt railroad. 455 U.S. at 470-71. The BAPCPA, in contrast, is uniformly applicable across the nation and does not target any isolated entity.

True, the Court has recognized that "the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power." *Gibbons*, 455 U.S. at 468. But a strict reading of this statement "overlooks the flexibility inherent in the constitutional provision," *Blanchette*, 419 U.S. at 158, and improperly cabins the reach of Congress's authority. It is worth noting that in every case considering the scope of the Clause, the Court merely assumed that the term "uniform" implied an affirmative restriction, and ultimately concluded that such a restriction could be satisfied by a law that is uniform only in form.

Nor does the original understanding of the Bankruptcy Clause support the federal versus state distinction that the Schultzes urge us to adopt. We need not belabor the point, as a historical account of the Bankruptcy Clause has been recounted numerous times, including once recently by this circuit. *See In re Hood*, 319 F.3d 755, 764-65 (6th Cir. 2003), *aff'd on other grounds*, *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004). It suffices to say the following: the Bankruptcy Clause emerged amidst a depressed economy, collapsing business ventures, and the prospect of commercial warfare between the various states. To combat mounting debt crises in the newly confederated America, states enacted "an ignoble array of legislative schemes" discharging the debt obligations of their citizens, primarily at the expense of out-of-state creditors. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427 (1934).

Faced with multiple obstacles for collecting debt, and the resulting economic harm, the Framers believed that a federal—and "uniform"—bankruptcy system would be necessary to reduce the problem inherent in applying varying state insolvency and bankruptcy rules, and to rein in the pro-debtor excesses of state legislatures. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 362-63 (2006) ("The history of the Bankruptcy Clause . . . demonstrate[s] that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena. Foremost on the minds of those who adopted the Clause were the intractable problems, not to mention the injustice, created by one State's imprisoning of debtors who had been discharged . . . in and by another State."); *Hood*, 319 F.3d at 764-65 ("Indeed, setting bankruptcy policies on the state level would enable states to favor in-state creditors over similarly-situated out-of-state creditors. By granting the power to Congress exclusively, the Constitution prevented runaway states from defeating bankruptcy's goals."); *In re Dehon, Inc.*, 327 B.R. 38, 56 (Bankr. D. Mass. 2005) ("[T]he use of the word 'uniform' in the Bankruptcy Clause was not primarily intended as a restriction on congressional power, but as a *grant* of power to Congress. The very structure of the clause and its placement in the Constitution clarify this point."). *See also* BRUCE H. MANN, REPUBLIC OF DEBTORS: BANKRUPTCY IN THE AGE OF

AMERICAN INDEPENDENCE 183-85 (2002); Kurt H. Nadelmann, *On the Origin of the Bankruptcy Clause*, 1 AM. J. LEGAL HIST. 215, 225-27 (1957).[5]

In light of this account, we find no merit in the Schultzes' argument that Congress can incorporate state laws, but cannot incorporate federal standards. At the time of the Constitutional Convention, the fear was not, at least in the bankruptcy context, of Congress discriminating in favor of or against a particular locality. Quite to the contrary, uniformity in the Bankruptcy Clause was viewed as a way to safeguard the nation's interest in establishing and maintaining a single system of debt and credit without interference from the parochial or otherwise obstreperous action on the part of the fifty states. *See Dehon*, 327 B.R. at 56 n.34.

### 3.

One final point needs to be addressed: We are not persuaded that the heightened scrutiny applied in *United States v. Ptasynski*, 462 U.S. 74, 84 (1983), is relevant to the interpretation of the Bankruptcy Clause. In *Ptasynski*, the Court considered whether a section of the Crude Oil Windfall Profit Tax Act granting an exemption for oil produced in certain regions near Alaska violated the uniformity provision in the Taxing Power. Although the Court ultimately upheld the exemption, it began its analysis with the presumption that the "the Uniformity Clause was proposed as one of several measures designed to limit the exercise of [Congress's] power," *id.* at 81, and applied a form of heightened scrutiny: "[W]here Congress does choose to frame a tax in geographic terms, we will examine the classification closely to see if there is actual geographic discrimination." *Id.* at 84-85.

However, the text and the background of the Taxing Power is wholly inapposite to that of the Bankruptcy Clause. We need not look any further than the plain language of the Bankruptcy Clause, which states: "[The Congress shall have Power] to establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4. Reading these words in conjunction with the Taxing Power, another clause in Congress's enumerated powers, reveals a striking contrast. The Taxing Power states: "The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, . . . *but* all Duties, Imposts and Excises *shall be* uniform throughout the United States." U.S. CONST. art. I, § 8, cl. 1 (emphasis added). If the Framers had intended both of these uniformity provisions to be read as an absolute limitation, requiring Congress to enact perfectly uniform laws, they presumably would have employed similar language in the Bankruptcy Clause by stating that "Congress shall have Power to establish Laws on the subject of Bankruptcies, but all such Laws shall be uniform throughout the United States." *See* Randolph J. Haines, *The Uniformity Power: Why Bankruptcy is Different*, 77 AM. BANKR. L.J. 129, 166-67 (2003) [hereinafter *The Uniformity Power*].

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), provides ample support for this reading of constitutional text. In his foundational analysis in *McCulloch*, Justice Marshall concluded that "necessary" as used in the Necessary and Proper Clause should be interpreted as conferring an additional grant of power, rather than a limitation on Congress's authority to choose only those means that were absolutely necessary: "1st. The clause is placed among the powers of congress, not

---

[5]Indeed, the only direct reference to the Bankruptcy Clause in the Federalist Papers conveys the idea that uniform bankruptcy laws were necessary to protect creditors in a national economy. James Madison recognized in No. 42 that "[t]he power of establishing uniform laws of bankruptcy, is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." THE FEDERALIST No. 42, at 239 (James Madison) (Clinton Rossiter ed., 1961). So did Alexander Hamilton in No. 32, when he explained that the word "uniform" in the Naturalization Clause—a provision that closely mirrors that of the Bankruptcy Clause—confers on Congress the "exclusive jurisdiction" to regulate within that area, "because if each State had power to prescribe a *distinct rule*, there could not be a *uniform rule*." THE FEDERALIST No. 32, at 199 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

along the limitations on those powers. 2d. Its terms purport to enlarge, not diminish the powers vested in the government." *Id.* at 419-20. Much like the Bankruptcy Clause, if Congress intended "necessary" to imply a restraint on the sphere of congressional authority, it "would have been expressed in terms resembling these. 'In carrying into execution the foregoing powers, and all others,' &c. 'no laws shall be passed but such as are necessary and proper.'" *Id.* at 420. *See also* Haines, *The Uniformity Power*, at 167. As it was in *McCulloch*, so it is here: the term "uniform" was intended to grant an additional power at the expense of the fifty states, rather than to limit the scope of Congress's delegated powers.

While it is true that the Supreme Court has "looked to the interpretation of [the Bankruptcy Clause] in determining the meaning of the [Taxation Power]," *Ptasynski*, 462 U.S. at 83 n.13 (citing *Blanchette*, 419 U.S. at 160-61), the Court has never found prior precedent in one area to be dispositive in the other, nor has it required appellate courts to apply the heightened scrutiny in *Ptasynski* to cases interpreting the Bankruptcy Clause. In fact, the Court in *Ptasynski* acknowledged in the very same footnote that "the purposes giving rise to the Bankruptcy Clause are not identical to those underlying the [Taxing Power's] Uniformity Clause . . . ." *Id.* The lengthy historical discussion in *Ptasynski* shows that the Taxing Power emerged from the "concern that the national government would use its power over commerce to the disadvantage of particular States," *id.* at 81, a history that stands in stark contrast to the problems inherent in applying varying state bankruptcy rules to debtors and creditors living in different states. In sum, uniformity of taxes and duties served to assure the states that Congress would not discriminate in favor of or against a particular locality, whereas uniformity in the bankruptcy context was viewed as a grant of power to standardize creditor relief across the nation, notwithstanding varying obtrusive state laws. We therefore find it inappropriate to employ the heightened scrutiny in *Ptasynski* and to determine whether the BAPCPA results in "actual geographic discrimination." *Id.* at 85.

### III. CONCLUSION

For those reasons, we **AFFIRM** the judgment of the district court.