NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1045n.06

No. 11-2181

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Oct 01, 2012*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| FRANK J. ELLIAS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| PHOENIX LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | **O P I N I O N** |
| | ) | |
| | ) | |

BEFORE: MOORE and COLE, Circuit Judges; and ROSE, District Judge.[*]

THOMAS M. ROSE, District Judge. Frank Ellias, Trustee of the Robert Rosen Family Irrevocable Trust[1] ("RFT") appeals the district court's order granting Phoenix Life Insurance Company's ("Phoenix's") motion for summary judgment and denying RFT's motion for summary judgment. The district court determined that RFT's breach-of-contract counterclaim was moot. For the following reasons, we **AFFIRM.**

I.      JURISDICTION

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

[1]The beneficiaries of the Rosen Family Irrevocable Trust are Rosen's four natural children and one foster child. R. 89 (Rosen Deposition at 80-910 (Page ID #1678-79).

The basis for the district court's subject matter jurisdiction was diversity of citizenship, 28 U.S.C. § 1332. Judgment was entered by the district court on September 14, 2011. This Appeal was timely filed on September 19, 2011. Thus, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     The First Policy

Robert Rosen ("Rosen") applied to Phoenix for the first of two $5,000,000 life insurance policies on March 27, 2006, naming himself as the insured and RFT as the "owner" and "beneficiary." R. 89 (Application for Life Insurance) (Page ID #1704). Rosen claims that he sought the two policies to give his estate necessary liquidity to pay anticipated estate taxes upon his death. R. 89 (Rosen Dep. at 17-18) (Page ID #1669).

In a form that Phoenix required of all persons applying for more than $2,000,000 of life insurance, Phoenix asked Rosen the following questions:

> (1) Is non-recourse premium financing or any other method being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being applied for?
>
> (2) Do you intend to finance any of the premium required to pay for this policy?

R. 89 (Statement of Client Interest) (Page ID #1710). On March 27, 2006, Rosen answered "no" to both of these questions, and affirmed that the document was "complete and true to the best of my knowledge." Id.

Phoenix issued the policy (the "First Policy") on April 18, 2006. R. 96 (Phoenix Mot. Summ. J. at 3) (Page ID #2078). Thereafter, Rosen signed an undated Policy Acceptance Form to be completed when a policy is delivered that contained a declaration that the "statements made in the application remain full, complete and true as of this date." R. 89 (Policy Acceptance Form) (Page ID #1713).

On May 12, 2006, RFT executed an "Assignment of Life Insurance Policy as Collateral" ("First Collateral Assignment") to LaSalle Bank, N.A. ("LaSalle"). R. 89 (Assignment of Life Insurance Policy as Collateral) (Page ID #1714-20). The Assignment gave LaSalle a security interest in "all of Borrower's claims, options, privileges, rights, title and interest in, to and under the insurance policy … as well as the proceeds to be paid out thereunder." Id.

Phoenix received notice of the First Collateral Assignment on May 24, 2006. R. 89 (Letter) (Page ID # 1721). That same day, RFT and LaSalle entered into a "Policy Control Agreement," giving LaSalle the "beneficial ownership" of the life insurance policy in the event of a default. R. 89 (Policy Control Agreement) (Page ID #1748-60). On June 26, 2006, LaSalle and RFT executed a Note and Security Agreement, which gave LaSalle the authority to "take the Policies away" in the event of a default. R. 89 (Note and Security Agreement) (Page ID # 1739-47). The loan allowed Rosen to make the initial premium payments on the first insurance policy. Id.

Rosen had applied for a premium financing program offered by Coventry Capital LLC ("Coventry") on December 19, 2005. R. 93 (Submission Form and Authorization) (Page ID #2029-

36). RFT's insurance broker confirmed with Coventry in a letter dated February 24, 2006, that Rosen and RFT were seeking such financing. R. 93 (Letter) (Page ID #2038-39).

**B.      The Second Policy**

On July 24, 2006, Rosen applied for a second life insurance policy, identical in all respects to the First Policy. R. 89 (Application for Life Insurance) (Page ID #1722-27). He was again asked about possible financing sources for the policy's premiums, as well as any potential interests in the policy that would be assigned to other parties, with questions that were different than those Phoenix asked for the First Policy:

> (1) Is non-recourse premium financing or any other method being utilized to pay premiums in order to facilitate a current or future transfer, assignment, or other action with respect to the benefits provided under the policy being applied for?
> …
> (9) Is there an intention that any party, other than the Owner, will obtain any right, title or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application?

Id. Rosen answered "no" to both questions. Id.

Phoenix issued the second policy on September 26, 2006. (the "Second Policy") (The First and Second Policies are referred to hereinafter as the "Policies.") R. 96 (Phoenix Mot. Summ. J. at 4) (Page ID #2079). Thereafter, Rosen again signed an undated Policy Acceptance Form to be completed when a policy is delivered that contained a declaration that the "statements made in the

- 4 -

application remain full, complete and true as of this date." R. 89 (Policy Acceptance Form) (Page ID #1730).

Rosen sought premium financing from LaSalle on the Second Policy as well. R. 89 (Note and Security Agreement) (Page ID # 1761-69.) A second Note and Security Agreement was executed on September 29, 2006. Id. On October 10, 2006, Phoenix received a Collateral Assignment ("Second Collateral Assignment"). R. 89 (Letter) (Page ID #1731-38). LaSalle's interest in the Second Policy was, for all intents and purposes, identical to its interest in the First Policy. R. 89 (Assignment of Life Insurance Policy as Collateral) (Page ID #1732-38).

C.    **Premium Financing Transaction Documents**

The transaction documents used for both policies include Assignment of Life Insurance Policy As Collateral Agreements (the "Collateral Agreements"), Policy Control Agreements and Note and Security Agreements. The Note and Security Agreements set forth the terms of the loan from LaSalle to RFT. R. 89 (Note and Security Agreements) (Page ID #1739-47, 1761-69). The loan proceeds are to be disbursed to Phoenix to pay premiums, to satisfy certain expenses, to reimburse RFT for payment of the initial life insurance premiums and to cover the financed portion of the loan origination fee. Id. Pursuant to the Note and Security Agreements, RFT gives LaSalle a security interest in the policy. Id. In the event of default on the loan, LaSalle may, at its option, accelerate the maturity of the loan and, among other things, terminate the coverage under the Policies and demand the return of and receive from the insurer any amounts due to the owner. Id.

The Collateral Agreements assign all of RFT's claims, options, privileges, rights, title and interest in the Policies as well as the policy proceeds. R. 89 (Assignments of Life Insurance Policy as Collateral) (Page ID #1714-20, 1732-38). So long as the policy has not been surrendered or cancelled, RFT retains the right to designate and change the beneficiary provided that LaSalle will continue to be the primary beneficiary to the extent of the principal amount of the loan. Id.

The Policy Control Agreements between RFT, as the owner, and LaSalle establish LaSalle as both the "Policy Intermediary" and the "Secured Party." R. 89 (Policy Control Agreements) (Page ID #1748-60, 1770-82). These agreements establish an accounts with LaSalle to facilitate the financing of premiums related to the Policies. Id. They indicate that RFT intends to borrow monies to fund policy premiums but does not intend to transfer or surrender ownership of the policy or the right to designate the policy beneficiary prior to the maturity of the borrowings. Id. They also indicate that RFT has the insurable interest in the life covered by the life insurance policy. Id. Finally, the Policy Control Agreements indicate that, if LaSalle forecloses on the policy or if RFT decides to relinquish the policy in satisfaction of the Note and Security Agreement, the policy's beneficial ownership transfers to LaSalle.

### D. Rescission of the Policies

On February 2, 2007, Phoenix sent a letter to Rosen and RFT expressing concern about the two newly-issued life insurance policies. R. 89 (Letter) (Page ID #1787-89). Phoenix informed Rosen and RFT that it was aware of the premium financing arrangements with LaSalle, and that it believed such agreements were "at variance" with the statements of intent Rosen made in his policy

applications. Id. RFT responded that it was "not aware of any basis for stating that these insurance policies were improperly issued and we fully expect Phoenix to comply with its contractual obligations." R. 89 (Letter) (Page ID #1790).

Phoenix sent a final letter on August 7, 2007, declaring that it was rescinding the Policies. R. 89 (Letter) (Page ID # 1791-98). After an internal investigation, Phoenix "concluded that both policies were part of a financing and transfer of ownership transaction that was not disclosed to Phoenix despite specific questions being asked of the insured and owner to elicit such information," and that the answers of Rosen and RFT to these questions were "inaccurate and misleading." (Id. at PAGEID #1795.) Phoenix indicated that, had it known of the nature of the financing and third party ownership transaction, it would not have issued either of the Policies. (Id.)

Phoenix returned the premiums that had already been paid to LaSalle. Id. After writing the letters to rescind the Policies, Phoenix filed suit for judicial rescission. Eastern District of Michigan Case No. 2:08-cv-11562, doc. #10 (Page ID #31-45).

Rosen and RFT claim that the rescission was improper because the statements of intent in the application were accurate. Id. at doc. #31 (Page ID #275-80). RFT elected to sue Phoenix for damages for unlawful rescission rather than repay the loans to LaSalle. Id. After Rosen and RFT filed their counterclaim in federal district court, they defaulted on both of the premium financing loans and LaSalle foreclosed. R. 89 (Ellias Deposition at 92-94) (Page ID # 1697-98).

E.      The Foreclosures

After receiving the rescissions, RFT did not pay off the LaSalle loans for the First or Second Policies.  The loan on the First Policy matured on August 26, 2008, and LaSalle foreclosed on the First Policy on September 11, 2008.  R. 96 (letter) (Page ID #2174).  The loan on the Second Policy was in default, and LaSalle foreclosed on the Second Policy on December 1, 2008.  R. 96 (letter) (Page ID # 2176).  LaSalle seized the Policies in satisfaction of the debt it held.  R. 89 (Policy Control Agreements) (Page ID # 1748-60, 1770-82).

### III.  RELEVANT PROCEDURAL BACKGROUND

On December 13, 2007, Phoenix sued the Raider-Dennis Agency in the U.S. District Court for the Eastern District of Michigan for breach of an express contract, breach of an implied contract and unjust enrichment.  R. 1.  On November 14, 2008, this case was joined with a later-filed case in which Phoenix was the plaintiff and LaSalle, RFT, Rosen, Coventry Capital, CBI Financial, the Raider-Dennis Agency and Larry Campagna were named defendants.  R. 15

RFT and Rosen filed a counterclaim against Phoenix in the later-filed lawsuit alleging a breach of contract.  Eastern District of Michigan Case No. 2:08-cv-11562, doc. #31.  This counterclaim was filed on October 2, 2008, and alleges that Phoenix wrongfully rescinded the two life insurance policies.  Id.

On March 30, 2009, Coventry Capital was dismissed.  R. 20.  The court found that the representations made by Rosen and RFT were not a part of the First Policy and could thus not be good cause for rescission under Michigan law.  Id.

On March 3, 2010, Phoenix, having successfully settled its rescission action, voluntarily dismissed all of its claims. R. 65. The remaining defendants were dismissed over the objection of Rosen and RFT. Id. The Policies were reinstated with Bank of America (f/k/a LaSalle) having ownership. R. 89, Ex. X. Rosen's and RFT's counterclaim against Phoenix remained to be adjudicated.

Phoenix, on one hand, and Rosen and RFT, on the other, filed cross-motions for summary judgment on the counterclaim. R. 89, 96. The district court granted Phoenix's motion for summary judgment and denied Rosen's and RFT's motion for summary judgment on August 25, 2011. R. 110 In doing so, the district court found that Rosen's and RFT's counterclaim was moot. Id. This appeal followed.

## IV. STANDARD OF REVIEW

This Court reviews a district court's decision granting summary judgment de novo using the same standards applied by the district court. *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 462 (6th Cir. 1998). Summary judgment may be granted if the evidence submitted shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

This Court also reviews the question of standing de novo. *Schultz v. United States*, 529 F.3d 343, 349 (6th Cir. 2008), *cert. denied*, 555 U.S. 1071 (2008). When jurisdiction is based upon diversity of citizenship, as is the case here, a plaintiff must have standing under both Article III and state law, Michigan in this case, to maintain a cause of action. *Morell v. Star Taxi*, 343 F. App'x 54,

57 (6th Cir. 2009) (citing *Mid-Hudson Catsill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418

F.3d 168, 173 (2d Cir. 2005)).

A.      **Article III Standing and Mootness**

A federal district court's subject matter jurisdiction is limited by Article III of the U.S.

Constitution to actual cases or controversies.  U.S. Const. Art. III, § 2.  One element of the case or

controversy requirement is that the plaintiff must establish it has standing to sue. *DaimlerChrysler*

*Corp. v. Cuno*, 547 U.S. 332, 342 (2006).  A plaintiff has Article III standing to sue when she or he

can show:  (1) an injury-in-fact that (2) was fairly traceable to the defendant's allegedly unlawful

conduct and (3) is likely to be redressed via a favorable decision.  *Schultz*, 529 F.3d at 349 (quoting

*Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007)).  Finally, standing is

determined as of the time the complaint is filed.  *Cleveland Branch, N.A.A.C.P. v. City of Parma,*

*Ohio*, 263 F.3d 513, 524 (6th Cir. 2001).

Mootness is distinct from standing.  *Id.* at 525.  Standing concerns only whether a plaintiff

has a viable claim at the time the complaint was filed, while mootness addresses whether that

plaintiff continues to have an interest in the outcome of the litigation.  *Id.*  An issue becomes moot

when the issue is no longer "live" or the parties lack a legally cognizable interest in the outcome.

*Id.* at 530.  Finally, the burden of demonstrating mootness is on the party claiming mootness.  *Id.* at

531.

B.      **Standing and Mootness Under Michigan Law**

Standing under Michigan law is a limited, prudential doctrine. *Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 699 (Mich. 2010). A plaintiff has standing under Michigan law "whenever there is a legal cause of action." *Id.* Where a cause of action is not provided at law, a plaintiff may have standing if the plaintiff "has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the [Michigan] Legislature intended to confer standing on the plaintiff." *Id.* Further, Michigan courts do not adjudicate" moot questions or declare principles of law that have no practical legal effect in the case" before the court. *Anglers of the Ausable, Inc. v. Dept. of Envtl. Quality*, 796 N.W.2d 240, 240 (Mich. 2011).

## V. ANALYSIS

### A. RFT'S STANDING

The issue of whether RFT had standing is reviewed de novo by this Court. Standing is determined at the time the complaint is filed. The complaint being considered here is a counterclaim filed by RFT on October 2, 2008. RFT must have standing pursuant to both Article III and Michigan law.[2]

RFT had standing when its counterclaim was filed if it can show an injury-in-fact that was "fairly traceable to the defendant's allegedly unlawful conduct" and is "likely to be redressed" via a favorable decision. At the time RFT's counterclaim was filed, RFT was the owner and beneficiary

---

[2]The district court held that RFT had standing under Michigan law to bring a breach-of-contract claim arising out of the rescission of the insurance policies. Nothing is said by the district court specifically regarding Article III standing.

of the policies but the policies had been rescinded by Phoenix. If the policies had been wrongfully rescinded, as claimed by RFT, RFT could show an injury in fact "fairly traceable" to Phoenix's allegedly unlawful conduct. Further, this alleged injury could have been redressed by a favorable decision. Thus, RFT had Article III standing when its counterclaim was filed.

Phoenix now argues that RFT never suffered an "injury in fact" because RFT never invested any money in the Policies and cannot identify a possible "windfall" that it might have obtained had it eventually decided to invest in the Policies. However, this argument is without merit.

At the time the counterclaim was filed, LaSalle had not foreclosed on the Second Policy. Thus, at that time, RFT still had an interest in the Second Policy and could arguably have been injured by rescission of that policy. Presumably RFT had not yet reached the point where it was required to invest any money in the Second Policy to avoid foreclosure. Thus, whether or not RFT had invested any money in the Second Policy at the time its counterclaim was filed is irrelevant as to whether RFT had suffered an injury-in-fact regarding the Second Policy. Phoenix, therefore, has not shown that RFT did not have standing regarding the Second Policy when the counterclaim was filed.

The First Policy had already been foreclosed upon by LaSalle when RFT's counterclaim was filed. RFT presents expert testimony that RFT suffered certain damages by Phoenix's alleged wrongful rescission of the First Policy. Although Phoenix attempts to discredit this expert's opinion, it provides enough evidence to avoid summary judgment on this issue. Thus, Phoenix has not shown that RFT did not have standing regarding the First Policy when the counterclaim was filed.

Phoenix also now argues that RFT cannot show that its alleged injury is "fairly traceable" to Phoenix's conduct. However, RFT's counterclaim alleges that Phoenix wrongfully rescinded the Policies. Thus, the counterclaim alleges an injury that is fairly traceable to Phoenix's conduct. RFT had Article III standing to bring its counterclaim.

RFT must also have standing under Michigan law to bring its counterclaim. RFT has standing under Michigan law if it has a legal course of action. Under Michigan law, RFT may bring a claim for breach of an insurance contract. Thus, RFT had standing under Michigan law to bring its counterclaim.

In sum, RFT had standing under Article III and Michigan law to bring its counterclaim. Since the district court judge determined that RFT had standing under Michigan law at the time RFT's Counterclaim was filed, that part of his order is affirmed.

## B.     MOOTNESS

The analysis next turns to whether RFT's counterclaim was moot at the time the district judge issued the order being appealed. That order was filed on August 21, 2011.

An issue becomes moot under federal law when the issue is no longer "live" or the parties lack a legally cognizable interest in the outcome. An issue is moot under Michigan law when the court is asked to declare principles of law that have no practical legal effect in the case before the court.

In this case, Phoenix rescinded the Policies on August 7, 2007. The Note and Security Agreement on the First Policy was foreclosed on September 11, 2008, and the Note and Security

Agreement on the Second Policy was foreclosed on December 1, 2008. When the Note and Security

Agreements were foreclosed, RFT's right, title and interest in the Policies were terminated.

Thus, on August 21, 2011, when the district judge ruled on the motion for summary

judgment, RFT had no right, title or interest in the Policies. Without any right, title or interest in the

Policies, RFT had no legally cognizable interest in the outcome of the summary judgment motion.

Further, any ruling at that time by the district judge would have no practical legal effect on RFT's

interest. Therefore, RFT's counterclaim was moot at the time of the district judge's ruling.

RFT argues in its Statement of the Case that its counterclaim was not moot because of the

rule against allowing a party to take advantage of its own breach, because of the doctrine of election

of remedies and because of the duty to mitigate damages. Each of these arguments will be addressed

seriatim.

### 1.      Taking Advantage of Its Own Breach

RFT argues that Phoenix cannot take advantage of its breach of the Policies by allegedly

wrongfully rescinding them. Further, according to RFT, it had no other choice but to default on the

loans because it did not want to pay on an outstanding loan for assets which had legally ceased to

exist.

The law provides that a party cannot benefit from its own breach. *GenCorp, Inc. v. Am. Int'l*

*Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999). Said another way, a party cannot take advantage

of his own default in the performance of a contract. *Id.* (citing *Cussler v. Firemen's Ins. Co.*, 260

N.W. 353, 356 (Minn 1935)).

To rescind a contract is to abrogate and undo it from the beginning and "restore the parties to the relative positions which they would have occupied if no such contract had ever been made." *Old Line Life Ins' Co. Of Am. v. Garcia*, 309 F. Supp. 2d 966, 969-70 (E.D. Mich. 2004), *rev'd on other grounds*, 411 F.3d 605 (6th Cir. 2005). Further, when a contract is rescinded, an action will not lie for breach of that contract. *Adam Kroehle's Sons Co. v. Rockford Oak Leather Co.*, 215 N.W. 324, 325 (Mich. 1927).

If the Policies were rescinded, as RFT argues as the basis for not paying the loan, then an action would not lie for breach of the Policies. If the Policies were not rescinded, then RFT should have paid the loan. RFT had the choice as to whether or not to treat the Policies as not rescinded and pay on the loans and elected not to. It would appear as though it is RFT that is attempting to benefit from its decision to treat the Policies as rescinded and not Phoenix.

In an attempt to overcome the rescission, RFT wants to hold Phoenix to the fiduciary standard established for ERISA plan administrators. However, parties to an insurance contract deal at arm's length and owe no fiduciary obligations to each other. *Bolden v. John Hancock Mut. Life Ins. Co.*, 422 F. Supp. 28, 31 (E.D. Mich. 1976).

### 2.      Election of Remedies

RFT argues that it was required by law to elect a remedy, and it elected to sue for breach of contract. According to RFT, Phoenix was, therefore, put on notice that RFT elected to treat the Policies as breached and seek damages for the breach.

The election of remedies doctrine is "a procedural rule which precludes one to whom there are available two inconsistent remedies from pursuing both. Its purpose is not to prevent recourse to the alternate remedies, but to prevent double redress for a single injury." *Riverview Co-op., Inc. v. First Nat'l Bank and Trust Co. of Mich.,* 337 N.W.2d 225, 226-27 (Mich. 1983). The essential elements of election of remedies are: (1) the existence of two or more remedies; (2) the inconsistency between such remedies; and (3) a choice of one of the remedies. *Id.* at 227. All elements must be satisfied to apply the doctrine. *Id.*

RFT cannot satisfy the first and second elements. RFT may believe that it had two options - pay the premiums or sue for damages - but they were not two remedies for breach of the Policies. RFT was not paying the premiums; LaSalle was. Thus, RFT's options, as RFT saw them, were to pay on the loan from LaSalle that it had committed to or sue Phoenix for breach of the Policies. Electing whether or not to pay LaSalle on the loans was not a remedy for breach of the Policies, and electing whether or not to pay LaSalle on the loans was not an inconsistent remedy for breach of the Policies. Thus, the doctrine of election of remedies does not apply to the choice that RFT argues that it had to make.

### 3. Duty To Mitigate

RFT argues that continuing to pay on an outstanding loan for assets which had legally ceased to exist would have been inconsistent with its duty to mitigate its damages. However, RFT has not cited any legal authority, and the Court is aware of none, suggesting that the duty to mitigate

damages requires a party to default on its debt obligations thereby resulting in foreclosure on the securitized asset in dispute.

None of RFT's arguments are availing. RFT's counterclaim was moot under Article III and Michigan law when it was to be adjudicated.

## VI.    CONCLUSION

Because we conclude that RFT's counterclaim was moot at the time the district judge was deciding the motions for summary judgment, we **AFFIRM** the judgment below. Also, since RFT's counterclaim was moot at the time the district judge issued the summary judgment order, RFT was not entitled to summary judgment.