**CITY OF DETROIT, Plaintiff,**

v.

**State of MICHIGAN and Comcast of Detroit, Defendants,**

and

**Michigan Attorney General, Intervening Defendant.**

Case No. 10–12427.

United States District Court,
E.D. Michigan,
Southern Division.

July 10, 2012.

John W. Pestle, Stephen F. MacGuidwin, Timothy J. Lundgren, Aaron M. Phelps, Varnum, Riddering, Schmidt & Howlett LLP, Grand Rapids, MI, for Plaintiff.

Robert G. Scott, Jr., Davis, Wright, Washington, DC, Spencer A. Sattler, Michigan Attorney General's Office, Michael S. Ashton, Fraser, Trebilcock, Lansing, MI, for Defendants.

Robert W. Beach, Spencer A. Sattler, Michigan Department of Attorney General, Lansing, MI, for Intervening Defendant.

## *OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND REQUIRING ADDITIONAL BRIEFING*

DAVID M. LAWSON, District Judge.

The City of Detroit has sued defendant Comcast of Detroit, the City's cable television provider, seeking to enforce the terms of the latest negotiated franchise agreement between Comcast and the City, which expired on February 28, 2007. The City contends that Comcast is a holdover tenant, and it must comply with all the terms of the expired agreement. Comcast maintains that it is operating under a new agreement that took effect by operation of a state law—the Uniform Video Services Local Franchise Act, Mich. Comp. Laws § 484.3301 *et seq.*—which took effect in 2007 and resulted in the elimination of the terms in the old franchise agreement that the City seeks to enforce. The City insists, however, that certain provisions of the Michigan Act are preempted by federal law and violate the Michigan constitution's guarantee to local units of government of control over their public spaces and rights-of-way, and the end result is that Comcast must comply with the old franchise agreement until a new one is approved by the City.

After the Court denied Comcast's motion to dismiss, the Michigan attorney general intervened to defend the Michigan Act, and all parties filed cross motions for partial summary judgment. The Court heard oral argument on October 27, 2011, and the parties have since sought and received permission to submit additional authority. The Court also received several amicus briefs. The Court now finds that the City has standing to challenge the validity of certain aspects of the Michigan Act on federal preemption grounds, but that it has no standing to challenge the Act's removal of municipalities' authority to enforce customer service and anti-discrimination provisions in existing franchise agreements, and that controversy is not ripe. The Court also finds invalid on federal preemption grounds the provisions of the Michigan Act addressing the modification of existing franchise agreements and barring enforcement provisions relating to public, government, and education channels. However, the Act's renewal procedures and its failure to require universal build-outs are not preempted by federal law. The Court also finds that the state attorney general has offered a construction of the Act that avoids a conflict with the state constitution, that is, that municipalities may refuse to approve a franchise renewal application and negotiate acceptable terms with the cable provider, without the standard form agreement automatically taking effect. Therefore, the Act does not violate the Michigan constitution. That holding leads to the conclusion that Comcast and the City have no current franchise agreement in place. Because Michigan law does not permit a franchisee

to be regarded as a holdover tenant, Comcast must be found to be a trespasser. The parties will be directed to address an appropriate remedy. Therefore, the Court will grant in part and deny in part each of the parties' motions for partial summary judgment.

## I. Facts and legislation

The facts of the case and the nature of the dispute were described in detail in the Court's earlier opinion denying Comcast's motion to dismiss. *See City of Detroit v. Comcast of Detroit, Inc.*, 771 F.Supp.2d 781, 783–85 (E.D.Mich.2011). To summarize, in 1994, Comcast assumed the obligations of a franchise agreement negotiated by the City and Comcast's predecessor, Barden Cablevision of Detroit. That agreement contained several features that were favorable to the City, including provisions that required Comcast to provide free hook-ups ("drops") and service to municipal and school buildings; maintain a network to facilitate communications among City buildings; furnish additional public, education, and government (PEG) channels and at least three PEG studios, plus mobile units, staff, and equipment; make payments to the Public Benefit Corporation to support PEG channels; and provide free transmission lines for the City's PEG channels. Before the agreement expired in February 2007, Comcast and the City began negotiating to renew the franchise. The City insisted that Comcast include in the new agreement language concerning consumer protections, anti-discrimination, and PEG channels, and on March 16, 2007, the City approved Comcast's application subject to additional terms that included those provisions. However, Comcast sent the City a letter on April 23, 2007 rejecting the franchise as approved. Instead, Comcast unilaterally declared that Michigan law deemed the franchise approved without the additional terms and has continued to operate in the

City of Detroit despite the absence of a franchise agreement approved by the City.

Comcast relies primarily on Michigan's Uniform Video Services Local Franchise Act ("the Michigan Act"), Mich. Comp. Laws § 484.3301 *et seq.*, to justify its position. The City insists that several parts of the Michigan Act are preempted by the Cable Communications Policy Act ("the Cable Act"), 47 U.S.C. § 521 *et seq.* Each body of legislation sets forth the respective obligations and limitations on cable operators and governmental franchising authorities. The dispute in this case can fairly be characterized as a disagreement over which provisions of the Cable Act are mandatory concerning cable operators' obligations and the authority of local governmental units, and which are merely permissive. The Cable Act contains an express preemption provision, and the parties do not seriously dispute the general proposition that state law cannot lawfully excuse a cable provider from complying with the mandatory parts of the Cable Act. As with most regulatory conflicts, however, the devil is in the details.

### A. The Cable Act

When Congress enacted the Cable Act in 1985 to add Title VI to the Communications Act of 1934, there existed an " 'ill-defined [*sic*] ... state of regulatory uncertainty' " created by the overlapping authority held by the FCC and local municipalities. *Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 767–68 (6th Cir.2008) (quoting *American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1559 (D.C.Cir. 1987)). The amending legislation "present[ed] the critical role of municipal governments in the franchise process ... while affirming the FCC s exclusive jurisdiction over cable service, and overall facilities which relate to such service." *Id.* at 768 (quoting *City of New York v. FCC,*

814 F.2d 720, 723 (D.C.Cir.1987)). The Act, together with the Cable Television Consumer Protection and Competition Act, Pub. L. No. 102–385, 106 Stat. 1460, passed in 1992, establishes a minimum level of services, PEG channel access, consumer protections, and anti-discrimination requirements that franchising authorities must include in their franchise agreements with cable operators. *See Time Warner Ent. Co., L.P. v. FCC,* 93 F.3d 957, 966 (D.C.Cir.1996). The national legislation establishes both a floor and a ceiling concerning performance requirements that must be included in franchise agreements and may be demanded from cable providers, it permits local franchising authorities to negotiate with cable operators for higher levels of service, and it prohibits laws and practices that fall below those levels. *See* 47 U.S.C. § 556(c) (stating that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded").

The Cable Act states that "[a] franchising authority may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction." 47 U.S.C. § 541(a)(1). A franchising authority can be "any governmental entity empowered by Federal, State, or local law to grant a franchise." 47 U.S.C. § 522(10). A "franchise" is defined as "an initial authorization, or renewal thereof . . ., which authorizes the construction or operation of a cable system." 47 U.S.C. § 522(9). "A municipal franchise granted to a cable operator has commonly specified the nature of the cable system to be constructed, the service to be provided, and the rate which may be charged for those services." H.R. Rep. 98–934, at 19 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4656. The "franchising authority," sometimes called a "lo-cal franchising authority, or "LFA," refers to "any governmental entity empowered by Federal, State, or local law to grant a franchise." 47 U.S.C. § 522(10). In states where the franchising process includes approval by a state agency as well as the local government, the legislative history indicates that the term "franchising authority" should include the agency as well as the local government. H.R. Rep. 98–934, at 45 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4682. Without a franchise, a cable operator cannot provide cable services. 47 U.S.C. § 541(b)(1). "By delegating this task to LFAs, the 1984 Act effectively 'preserve[d] the role of municipalities in cable regulation.'" *Alliance for Cmty. Media,* 529 F.3d at 768 (quoting *City of Dallas, Tex. v. FCC,* 165 F.3d 341, 345 (5th Cir.1999)).

Section 541 "enumerates various requirements cable operators must follow to acquire cable franchises." *Alliance for Cmty. Media,* 529 F.3d at 768. Under section 541, the franchising authority also "shall assure" that no local residents are denied cable services based on their income, "may require adequate assurance that the cable operator will provide adequate public, educational, and governmental access channel capacity, facilities, or financial support," and "may require adequate assurance that the cable operator has the financial, technical, or legal qualifications to provide cable service." 47 U.S.C. § 541(a)(3)-(4). The public, educational, and governmental access channels ("PEG channels") also receive special protection in section 531, which allows a franchising authority to set requirements within a franchise for designating certain channels for PEG use—but "only to the extent provided in this section"—and to require such designations within the franchise or franchise proposal documents. 47 U.S.C. § 531(a)-(b). Subsection 531(c) grants enforcement authority for PEG

channel designation to the franchising authority:

> A franchising authority may enforce any requirement in any franchise regarding the providing or use of such channel capacity. Such enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator which relate to public, educational, or governmental use of channel capacity, whether or not required by the franchising authority pursuant to subsection (b) of this section.

47 U.S.C. § 531(c). This section does not specify how the franchising authority may pursue enforcement measures.

Section 544 governs the regulation of services, facilities, and equipment under a franchise and prevents the franchising authority regulating those aspects from taking action "except to the extent consistent with this subchapter." 47 U.S.C. § 544(a). The subchapter allows the local franchising authority to establish requirements for new or renewed franchises and enforce the obligations in existing franchise agreements. 47 U.S.C. § 544(b)-(c). However, "[a]ny Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." 47 U.S.C. § 544(f)(1).

Sections 545 and 546 govern the procedures for modification and renewal of existing franchises. The legislative history of the Cable Act indicates that these provisions were established to "provide protection to the cable operator" and are "not mandatory." H.R. Rep. 98–934, at 20, 26, 72 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4657, 4663, 4709. But the drafters anticipated that these provisions would supplement existing procedures and that the majority of renewals would occur "without regard to this section." H.R.

Rep. 98–934, at 72 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4709. A cable provider may request modification of a franchise if the provider demonstrates that an existing requirement of the franchise is "commercially impracticable" or, with respect to a change in services, that the change will not affect "the mix, quality, and level of services" provided under the franchise agreement. 47 U.S.C. § 545(a)(1); H.R. Rep. 98–934, at 71 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4708. The Act requires that a franchising authority make a final decision on a modification request in a public proceeding within 120 days; that decision is appealable to either a federal or state court. 47 U.S.C. § 545(a)(2), (b)(1) & 555(a).

To commence the renewal process, the franchising authority may hold a public proceeding, affording notice and participation opportunities to the public, to discuss the cable needs of the community and the cable operator's performance. The franchising authority must hold such a proceeding if timely requested by the cable operator, and the cable operator may not begin the renewal process until after the proceeding has been completed. 47 U.S.C. § 546(a), (b)(1). The statute also lays out a detailed procedure for renewing a franchise. The cable operator's renewal proposal submitted to the franchising authority "shall contain such material as the franchising authority may require." 47 U.S.C. § 546(b)(2). After the franchising authority receives the proposal, the Cable Act instructs it to provide public notice of the proposal and either renew the franchise or issue a preliminary assessment against renewal within four months. 47 U.S.C. § 546(c)(1). Either the cable operator or the franchise authority may commence an administrative proceeding to consider whether the operator has complied with governing laws and to assess the quality of services provided, the operator's

ability to provide the services, and whether the proposal is reasonable. *Ibid.* Following the proceeding, the franchising authority "shall issue a written decision granting or denying the proposal for renewal based upon the record of such ·proceeding." 47 U.S.C. § 546(c)(3). The statute sets out several valid grounds for denying a renewal proposal and grants a cable operator the right to appeal the final decision or failure to decide to a state or federal district court. 47 U.S.C. § 546(d), (e)(1).

Finally, the Cable Act includes a provision clarifying the interaction between Federal, State, and local authority. The Cable Act provides that "[n]othing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare," and that "[n]othing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services." 47 U.S.C. § 556(a)-(b). However, both provisions caution that State action is not restricted or affected to the extent that it is consistent with the provisions of the Act. *Ibid.; see also* H.R. Rep. 98–934, at 94 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4731. For example, "the state may exercise its authority over cable either by establishing a state franchising authority or by placing conditions on a local government's grant of a cable franchise" in order to ensure that certain mandatory federal provisions are included in the franchise. H.R. Rep. 98–934, at 94 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4731. The Cable Act also states that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority ... which is inconsistent with this chapter shall· be deemed to be preempted and superseded." 47 U.S.C. § 556(c); *see also* H.R. Rep. 98–934, at 94 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4731.

### B. The Michigan Act

According to the legislative analysis furnished by the Michigan house of representatives fiscal agency, the Michigan Act was intended to facilitate new cable operators' entrance into the market throughout Michigan communities in order to foster competition by eliminating the cumbersome process of navigating through the varied requirements of individual municipalities. It was not intended to favor incumbent operators, who in many markets enjoyed a *de facto* monopoly, but rather to "encourag[e] more providers to enter the market." House Fiscal Agency, Legislative Analysis of Uniform Video Services Local Franchise Act (House Bill 6456, H–2 Substitute, with Floor Amendment), First Analysis, dated November 14, 2006, at 2, available at http://www.legislature.mi.gov/ documents/2005–2006/illanalysis/House/ pdf/2005–HLA–6456–3.pdf (last visited July 9, 2012) (hereinafter "House Legislative Analysis").

The Michigan Act, promulgated in early 2007, reaffirmed that a cable operator cannot provide cable or video services within an area without first obtaining a franchise from the local unit of government, and it created a uniform form for cable operators to use when applying for a franchise from a municipality anywhere in the state. Mich. Comp. Laws §§ 484.3302–484.3303. After a cable operator submits the proposed Uniform Franchise Agreement to the "franchising entity" (i.e., the local unit of government), the Michigan Act requires the franchising entity to notify the provider as to the completeness of its submission within 15 days and inform the operator of the portions that are not complete. Mich. Comp. Laws § 484.3303(2). The franchising entity has 30 days from the submission date to approve a complete agreement. Mich. Comp. Laws § 484.3303(3). "If the franchising entity does not notify the pro-

vider regarding the completeness of the franchise agreement or approve the franchise agreement within the time periods required under this subsection, the franchise agreement shall be considered complete and ... approved." Mich. Comp. Laws § 484.3303(3). The Michigan Act establishes ten-year terms under a Uniform Franchise, with a ten-year renewal period available upon application by the cable operator. Mich. Comp. Laws § 484.3303(7). The Michigan Act provides no further details on the renewal process for uniform franchise agreements, except to reference the process for initial applications.

For franchises existing at the time of the Michigan Act's promulgation, the Act explicitly states that "any provisions of an existing franchise that are inconsistent with or in addition to the provisions of a [uniform franchise agreement] are unreasonable and unenforceable by the franchising entity" and that "no existing franchise agreement ... shall be renewed or extended upon the expiration date of the agreement." Mich. Comp. Laws § 484.3305(3), (1). Instead, the Act establishes three ways to create a valid Uniform Franchise: terminate the existing agreement and enter into a Uniform Agreement before the expiration date; amend the existing franchise agreement to include only the provisions applicable under the Michigan Act and the Uniform Franchise Agreement; or operate under the expired franchise until a uniform agreement is put into place, which must occur within 120 days of enactment. Mich. Comp. Laws § 484.3305(2). Legislative history for the Michigan Act makes little reference to the Cable Act or the potential conflict between the state and federal law, except to note that "[a]mong the stated purposes of federal telecommunications law is ... to 'establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems

are responsive to the needs and interests of the local community.'" House Legislative Analysis at 5.

On January 30, 2007, the Michigan Public Service Commission issued the standard form pursuant to the Act. *See* Mich. Comp. Laws § 484.3302. The form includes a list of requirements with which cable operators must comply, including:

C. The Provider agrees to comply with all valid and enforceable federal and state statutes and regulations.

D. The Provider agrees to comply with all valid and enforceable local regulations regarding the use and occupation of public rights-of-way in the delivery of the video service, including the police powers of the Franchising Entity.

. . .

F. The Provider shall comply with the public, education, and government programming requirements of Section 4 of the Act.

G. The Provider shall comply with all customer service rules of the Federal Communications Commission under 47 CFR 76.309(c) applicable to cable operators and applicable provisions of the Michigan Consumer Protection Act, 1976 PA 331, Mich. Comp. Laws 445.901 to 445.922.

. . .

I. The Provider shall comply with the Consumer Privacy Requirements of 47 U.S.C. § 551 applicable to cable operators.

. . .

A. The Provider shall not deny access to service to any group of potential residential subscribers because of the race or income of the residents in the local area in which the group resides.

. . .

A. A video service Provider shall calculate and pay an annual video service provider fee to the Franchising Entity.

. . .

C. The Franchising Entity shall not demand any additional fees or charges from a provider and shall not demand the use of any other calculation method other than allowed under the Act.

. . .

A. The video service Provider shall designate a sufficient amount of capacity on its network to provide for the same number of public, education, and government access channels that are in actual use on the incumbent video provider system on the effective date of the Act or as provided under Section 4(14) of the Act.

. . .

A. The video service Provider shall also pay to the Franchising Entity as support for the cost of PEG access facilities and services an annual fee . . . .

. . .

A. The Provider shall establish a dispute resolution process for its customers. Provider shall maintain a local or toll-free telephone number for customer service contact.

Michigan Public Service Commission, Instructions for Uniform Video Service Local Franchise Agreement, available at http://www.michigan.gov/documents/mpsc/uniform_video_services_local_franchise_agreement_275178_7.doc (last visited July 10, 2012); *see also* Mich. Comp. Laws §§ 484.3302(3), 484.3304. The form itself specifically prevents municipalities from altering the Uniform Franchise Agreement. However, the franchising entity and a cable operator may enter into a "voluntary franchise agreement" with additional terms. Mich. Comp. Laws § 484.3313. The Michigan Act also grants the Michigan Public Service Commission the authority to adjudicate violations of the Act and award remedies consisting of fines, revocation of franchise agreements, or cease and desist orders. Mich. Comp. Laws § 484.3314.

## II. Parties' arguments

The City argues in its motion for partial summary judgment that several provisions of the Michigan Act conflict with the Cable Act expressly or by implication, and therefore the Michigan law is preempted by federal law. The conflicting provisions, says the City, are those dealing with renewal and modification of franchises, requiring support for PEG programming, enforcement of franchise provisions including those regulating PEG channels and customer service requirements, anti-discrimination and redlining, and build-out requirements. The City also contends that article 7, section 29 of the Michigan constitution commits to local governments the authority to issue franchises to public utilities seeking to operate within municipal boundaries, and the Michigan Act contravenes that provision by prescribing a uniform franchise agreement that interferes with the City's authority to negotiate terms with franchisors. Finally, the City argues that because the Michigan Act is preempted and the Cable Act requires that cable operators have a franchise, the 1985 Agreement remains in effect. The City notes that the Cable Act does not allow cable operators to operate without a franchise and argues that operators that continue to operate after a franchise agreement expires are holdover tenants, subject to the terms of the expired agreement.

Intervening defendant State of Michigan bases its argument primarily on the idea that local governments are creatures of legislation and subdivisions of the state, and derive any franchising authority they have from the state. Therefore, the argument goes, the Michigan legislature has the power to place limits on the terms that

local governments may impose on companies through their power to grant franchises. Of course, the relationship between the state and its local units of government is governed by the state constitution, and article 7, section 29 of that constitution speaks to a municipality's authority to grant franchises. But another section of that constitution, article 7, section 22, addresses in general terms the authority of cities to adopt ordinances and subjects that authority "to the constitution and law." Mich. Const. art. 7, § 22 (1963). The State contends, therefore, that the Michigan Act is a proper limitation on the City's franchising authority.

The State also contends that the City does not have standing to challenge the Michigan Act because it has not suffered any harm. It presents its standing argument in four parts. First, the State argues that the City was not harmed by the purported modification of the 1985 Agreement by the Michigan Act, primarily because the City has not alleged that Comcast violated the terms of the 1985 Agreement, nor that the City attempted to enforce the terms of that Agreement. Second, the State contends that the City has not been harmed because it has not been denied PEG channel access. The State points out that the City has not alleged that it requested assurances of adequate capacity from Comcast, nor explained when it might require more PEG channels than are currently available. Third, the State says that the City has not alleged that defendant Comcast has violated the Michigan Act's customer service provisions. Fourth, the State argues that the City cannot challenge the Michigan Act's anti-discrimination provisions because it has not alleged that Comcast has violated those provisions.

Finally, the State maintains that the renewal provisions of the Michigan Act do not conflict with and therefore are not preempted by the Cable Act. It insists that the Michigan Act's renewal procedures supplement the Cable Act's renewal procedures and are consistent with the goals of the Cable Act. The State believes that the Cable Act sets forth mostly broad guidelines for the regulation of cable systems, and therefore it does not occupy the entire regulatory field and leaves certain issues to state and local determination. More significantly, the State does not read the Michigan Act as precluding franchising entities from rejecting a franchising agreement proposal. The State argues that the provision that the City cites for the proposition that franchising authorities are not permitted to deny franchise applications under the Michigan Act actually provides only that if a franchising proposal is not approved—that is, acted upon—within 30 days, it is considered approved. *See* Mich. Comp. Laws § 484.3303(3). The State reads that section as allowing a franchising authority to announce that it plans to review the proposal, and then the Cable Act permits the franchising entity to conduct a contested case to determine whether it had a legal basis to reject the proposal. *See* 47 U.S.C. § 546(c)(1), (d). The States argues that the Michigan Act should be interpreted to be consistent with the federal act to the extent possible, and it urges the Court to interpret the Michigan Act to permit a franchising entity to deny a proposal even if the proposal is a uniform agreement. The State points out that the Michigan Act allows franchise authorities and cable operators to reach voluntary agreements that are different from the uniform franchise agreement contained in the Michigan Act, and therefore a franchising authority would be in its rights to reject a uniform agreement and work towards a voluntary agreement.

For its part, Comcast repeats the State's argument that the power to define the extent of local governments' role as a fran-

chising authority lies with the state. Therefore, Comcast insists, the Michigan Act is consistent with the Cable Act and the state constitution. Comcast reads the Cable Act and its legislative history as allowing the state to take over some or all of the franchise process; the division of labor on franchising was left to the state. Comcast also says that although the renewal and modification provisions of the Michigan Act are consistent with the Cable Act, those provisions do not apply here in any event because the 2007 franchise was a new agreement, not a renewal. Moreover, it argues, the renewal procedures established by the Cable Act are permissive only and not mandatory; therefore, the State is free to establish procedures of its own. Next, Comcast argues that the anti-discrimination provisions of the Michigan Act are consistent with the Cable Act; the Michigan Act prohibits discrimination against low-income persons just as the Cable Act does. Next, Comcast contends that the PEG provisions of the Cable Act do not provide minimum requirements for cable operators and thus do not preempt the Michigan Act. Moreover, according to Comcast, the Cable Act's language is permissive and does not require any franchising authority, whether state or local, to establish PEG capacity, facilities, or financial support. Comcast also argues that the customer service provisions of the Michigan Act are not preempted by the Cable Act because the state, not the city, retains the power under the Cable Act to allocate franchising authority, responsibilities, and oversight. Comcast also believes that the Michigan Act is compatible with the Cable Act's customer service standards; the Michigan Act not only fully incorporates the customer service standards in the Cable Act, but also incorporates that Michigan consumer protection act. Comcast also mimics the State's argument that there is no implied preemption because the Michigan Act, intended to promote and foster competition, is in harmony with the stated purposes of the Cable Act.

Lastly, Comcast says that each of the plaintiff's claims anticipate events that have not yet happened and may never happen, and therefore the controversy is not ripe for adjudication. Comcast observes that the franchise renewal process had stalled before the Michigan Act was enacted, and because the Cable Act gives cable operators, and not cities, the right to challenge a renewal or modification process in court or require a cable operator to renew a franchise, there is nothing in the Cable Act to prevent a cable operator from allowing its unmodified franchise to expire consistent with state law and to obtain a "new" authorization under that state law. Comcast also states that the plaintiff has made no factual allegation of a concrete dispute with respect to any other provision of the Cable Act.

### III.

As mentioned above, the parties have filed cross motions for partial summary judgment. The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir.2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir.2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties have not seriously contested the basic facts of the case. Where the material facts are mostly settled, and the question before the court is purely a legal one, the summary judgment procedure is well suited for resolution of the case. *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009).

Although some of the parties' arguments apply to the concept of preemption generally, the Court believes it is more useful to address the specific provisions of the statutes in turn. The ultimate question is whether Comcast is in compliance with the terms of both federal and state law that mandates that a valid franchise be in place before a cable operator can furnish and charge for cable services in a municipality.

A. Renewal and modification procedures

The State and Comcast contend that the Court does not have subject matter jurisdiction to entertain the City's challenge to the Michigan Act's renewal and modification procedures. The State argues that the City lacks standing, and Comcast contends the claim is not ripe.

 Standing and ripeness are important jurisdictional concepts, although neither defendant raised them in their initial challenge to jurisdiction stated in their motions to dismiss. Nevertheless, " 'a plaintiff must demonstrate standing separately for each form of relief sought.' " *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589

(2006) (quoting *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)); *see also Johnson v. Turner*, 125 F.3d 324, 338 (6th Cir.1997). "To establish Article III standing, a litigant must show (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that the injury will likely be redressed by a favorable decision." *Barnes v. City of Cincinnati*, 401 F.3d 729, 739 (6th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

 The injury must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130 (internal quotations and citations omitted). "[A] plaintiff is not entitled to injunctive or declaratory relief '[a]bsent a sufficient likelihood that he will again be wronged in a similar way,' *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), unless the plaintiff is subject to 'continuing, present adverse effects,' *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)." *Schultz v. United States*, 529 F.3d 343, 349 (6th Cir.2008); *see also Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir.2006) ("In the context of a declaratory judgment action, allegations of past injury alone are not sufficient to confer standing. The plaintiff must allege and/or 'demonstrate actual present harm or a significant possibility of future harm.' ") (quoting *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir.1998)). For example, the Sixth Circuit has held that a plaintiff who has *repeatedly* attempted to obtain employment with a municipality had standing to challenge certain hiring practices. *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 528 (6th Cir. 2001). The injury also must be "fairly

traceable" to the defendants' conduct. *Schultz*, 529 F.3d at 349 (internal quotation marks omitted).

■ The State argues that the City has no standing to challenge the franchise modification provisions of the Michigan Act insofar as it permitted modification of the 1985 Agreement because the City has not alleged that Comcast breached the 1985 Agreement and the City has not attempted to enforce the 1985 Agreement. This contention is perplexing; the central focus of City's complaint is that Comcast must abide by the terms of the 1985 Agreement and has failed to do so. The lone case that the State cites for the proposition that the plaintiff cannot challenge the modification of the 1985 Agreement until it seeks to enforce it, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), does not stand for that proposition. In *Warth*, the Supreme Court held that a building association lacked standing to challenge a zoning ordinance because none of the members of the association had been precluded from pursuing a project because of the ordinance. *Id.* at 516, 95 S.Ct. 2197. In other words, the building association could not point to any specific injury to any of its members resulting from the ordinance. There is simply nothing in this case that implies that in order to have standing to challenge a modification to a contract one must first have sought to enforce the terms of the contract. In contrast, here the City points to a specific injury resulting from the modification of the 1985 Agreement: defendant Comcast has ceased providing services and funds to the plaintiff. The City has satisfied the constitutional requirements of standing for its challenge to the renewal and modification procedures mandated by the Michigan Act.

■ The concept of "ripeness 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' ... The ripeness doctrine serves to 'avoid[ ] ... premature adjudication' of legal questions and to prevent courts from 'entangling themselves in abstract' debates that may turn out differently in different settings." *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir.2008) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003)). The Sixth Circuit has explained that " ' "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." ' *Cooley v. Granholm*, 291 F.3d 880, 883–84 (6th Cir.2002) (quoting *Texas v. United States*, 523 U.S. 296, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). As a rule, we do not allow litigation on premature claims to ensure that courts litigate 'only existing, substantial controversies, not hypothetical questions or possibilities.' *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir.1989)." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 581–82 (6th Cir.2008). Another factor in the ripeness consideration is whether there is sufficient "hardship to the parties [in] withholding court consideration" until there is a legal action for damages. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated with respect to other principles by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

■ Comcast argues that the City's claims are not ripe because the City alleges only that Comcast breached the 1985 Agreement after that agreement had already expired. That argument in turn is based on Comcast's notion that once the franchise agreement expires on its own terms, there can be no "renewal," and Comcast must be treated as a new appli-

cant for a new franchise. But that idea ignores the reality that Comcast is the incumbent cable operator and has no intention of withdrawing from that market. Treating Comcast as a "new" applicant makes no sense under the language and purposes of either the Cable Act or the Michigan Act. The Cable Act builds in due process protections for incumbent operators throughout the renewal process, presumably recognizing their capital investment in infrastructure. *See, e.g.,* 47 U.S.C. § 546(c)(1) (requiring public notice of an incumbent operator's renewal proposal and a decision within four months); § 546(c)(3) (requiring "a written decision granting or denying the proposal for renewal based upon the record of such proceeding"); § 546(d), (e)(1) (establishing grounds for denial of renewal and a right to appeal); *see also* H.R. Rep. 98–934, at 73 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4710. The Michigan Act focuses primarily on new applicants for a franchise and purportedly was intended to facilitate market entrance by them and competition. *See* House Legislative Analysis at 2. The fact that the alleged breaches of the 1985 Agreement occurred after that agreement expired, therefore, is irrelevant. The City contends that Comcast remained bound by the 1985 Agreement after its expiration, and therefore its failures to provide services and funds as required under that agreement constituted a breach of the agreement. Comcast's failure to provide those services and funds is the concrete factual claim that allows the Court to adjudicate this dispute under Article III; the risk that Comcast will continue to withhold those services and funds constitutes the hardship faced by the City if the Court refuses to adjudicate the complaint. *See Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.,* 584 F.3d 253, 263 (6th Cir.2009). This aspect of the City's claim is clearly ripe for judicial resolution.

The City contends that the renewal and modification procedures are preempted by the Cable Act. Federal preemption is based on the Supremacy Clause of the United States Constitution. U.S. Const. art. 6, cl. 2. In preemption cases, "[t]he purpose of Congress is the ultimate touchstone." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Traditionally, the Supreme Court has identified two types of preemption: express preemption and implied preemption. *State Farm Bank v. Reardon,* 539 F.3d 336, 341–42 (6th Cir.2008) (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). Express preemption occurs when Congress so states in legislation. "There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United States,* —— U.S. ——, 132 S.Ct. 2492, 2500–01, 183 L.Ed.2d 351 (2012) (citing *Chamber of Commerce of United States of America v. Whiting,* 563 U.S. ——, ——, 131 S.Ct. 1968, 1974–75, 179 L.Ed.2d 1031 (2011)). Implied preemption is further subdivided into at least two categories: "field preemption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (internal citations and quotation marks omitted).

"[I]n all preemption cases, and particularly in those in which Congress has

legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine,* 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (internal quotation marks and ellipses omitted); *see also Wimbush v. Wyeth,* 619 F.3d 632, 642–43 (6th Cir.2010). The Supreme Court has explained that conflict preemption can occur in one of two ways: "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Fed. Sav. and Loan Assoc. v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (internal quotations and citations omitted). Conflict preemption analysis "should be narrow and precise, 'to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.'" *Downhour v. Somani,* 85 F.3d 261, 266 (6th Cir.1996) (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n,* 489 U.S. 493, 515, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989)).

The Cable Act contains express preemption language, providing that "any provision of the law of any State ... which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c). The City argues that the Michigan Act is preempted by the Cable Act based on both express preemption and implied preemption. It does not contend that field preemption applies here, but it does maintain that the Michigan Act conflicts with the Cable Act, both because it is impossible to comply with certain aspects of both laws, and because the Michigan Act creates an obstacle to achieving the purpose behind the Cable Act.

The City argues that the Cable Act provides a set of procedures for renewal and modification of franchise agreements that are designed to protect the needs of local communities, and the Michigan Act eliminates those procedures and provides for unilateral renewal and modification of franchise agreements. The defendants argue that the Michigan Act fills gaps in the procedures outlined in the Cable Act and the renewal and modification procedures in the Cable Act are optional rather than mandatory.

### 1. Renewal

Both the text and the legislative history of the Cable Act suggest that the renewal procedures contained in 47 U.S.C. § 546 are not mandatory. Section 546 governs the procedures to be used in the event that a franchising authority and a cable operator cannot agree to a renewal of the franchise. In such an event, the statute provides that "[a] franchising authority *may* ... commence a proceeding which affords the public in the franchise area appropriate notice in participation," after which a "cable operator seeking renewal of a franchise *may* ... submit a proposal for renewal." 47 U.S.C. § 546(a)(1), (b)(2) (emphasis added). Use of the word "may" in this context suggests that neither the public proceeding nor the submission of proposals is required, and that the parties are free to proceed in a different manner. The legislative history of the Cable Act supports this view of the language. The House Committee stated in its report that it expected that the "vast majority" of franchises would not go through this renewal process. *Union CATV, Inc. v. City of Sturgis,* 107 F.3d 434, 438 n. 2 (6th Cir.1997) (quoting H.R. Rep. No. 98–934 at 72, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4709). The House Report describes this provision in the legislation and then states explicitly that "[t]he provisions contained

in this section are not mandatory." H.R. Rep. No. 98–934 at 72, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4709.

■ The fact that this renewal procedure is not mandatory suggests that Congress envisioned the possibility of alternative procedures, such as those contained in the Michigan Act. The Cable Act merely describes one possible renewal procedure; using another procedure, such as that contained in the Michigan Act, would not put a franchising authority out of compliance with the Cable Act. Therefore, the Michigan Act renewal procedures do not contradict the Cable Act and are not preempted on that basis, as it would not be physically impossible to comply with both the Michigan Act and the Cable Act.

Comcast reads the Michigan Act as mandating renewal 30 days after a franchising authority receives a "complete" renewal application, even if the franchising authority disagrees with the cable operator's renewal proposal. *See* Mich. Comp. Laws § 484.3303(3). If that is so, the City counters, then the state statute trenches upon the City's home rule rights granted by article 7, section 29 of the Michigan constitution. That provision states:

No person, partnership, association or corporation, public or private, operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other utility facilities, without the consent of the duly constituted authority of the county, township, city or village; or to transact local business therein without first obtaining a franchise from the township, city or village. Except as otherwise provided in this constitution the right of all counties, townships, cities and villages to the reasonable control of their highways, streets, alleys and public

places is hereby reserved to such local units of government.

Mich. Const. art. 7, § 29 (1963). And, the City asserts, those rights must be broadly construed per article 7, section 34, which states:

The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor. Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution.

Mich. Const. art. 7, § 34 (1963).

■ The Michigan attorney general, on behalf of the State, correctly points out that the Court should interpret the state law in a way that is consistent with federal law where possible, *see Rushton v. Schram*, 143 F.2d 554, 559 (6th Cir.1944), and the general caution against avoiding a statute on constitutional grounds where possible counsels the same approach, *U.S. ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 407–08, 29 S.Ct. 527, 53 L.Ed. 836 (1909) ("It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity . . . . [W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." (internal citations omitted)); *see also National Federation of Independent Business v. Sebelius*, — U.S. ——, ——, 132 S.Ct. 2566, 2594, 183 L.Ed.2d 450 (2012) (observing that " 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality' "

(quoting *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895))). He reasons that the two statutes can be reconciled because the Cable Act offers the option to both a cable operator and a franchising authority of pursuing a contested case when the renewal process is stalled by disagreements, *see* 47 U.S.C. §§ 546, 555, and the Michigan Act allows the parties to negotiate additional terms on a consensual basis, *see* Mich. Comp. Laws § 484.3313.

 The Michigan Act does contain language that seems to vitiate municipalities' power to withhold consent from a uniform franchise agreement. *See* Mich. Comp. Laws § 484.3303(3) ("A franchising entity shall have 30 days after the submission date of a complete franchise agreement to approve the agreement. If the franchising entity does not notify the provider regarding the completeness of the franchise agreement or approve the franchise agreement within the time periods required under this subsection, the franchise agreement shall be considered complete and the franchise agreement approved."); Mich. Comp. Laws § 484.3308(1) ("A franchising entity shall allow a video service provider to install, construct, and maintain a video service or communications network within a public right-of-way and shall provide the provider with open, comparable, nondiscriminatory, and competitively neutral access to the public right-of-way."). But the interpretation of the Michigan Act urged by the State—that municipal governments retain the right to deny franchising entities' proposed agreements, and that in the event a municipality denied a uniform franchise application within the 30–day period, a municipal government would be permitted to work toward achieving a voluntary agreement under the Michigan Act—is a plausible construction of the statutory text. The State presumably reads section 3303(3) as requiring "action" on an application by a municipality within 30 days, and that action could be in the form an approval or rejection. Such an interpretation preserves the City's rights under article 7, section 29 of the state constitution and is consistent with the procedures outlined in the Cable Act.

The Court finds that the Michigan Act's procedures for renewal, as so interpreted, do not conflict with (and therefore are not preempted by) the Cable Act and do not violate the Michigan constitution.

### 2. Modification

The modification procedures in the Cable Act, by contrast, contain language suggesting that the prescribed procedures are mandatory. The Cable Act states that a cable operator may obtain a modification "*if* the cable operator demonstrates" that the requirement it seeks to modify is commercially impracticable and that the proposed modification is appropriate on that basis or that the level of services under the franchise will be maintained. 47 U.S.C. § 545(a)(1)(A), (B) (emphasis added). Franchising authorities "*shall*" make final decisions on these modification requests "in a public proceeding ... within 120 days." 47 U.S.C. § 545(a)(2) (emphasis added). That language suggests, in contrast to the language governing renewal procedures, that Congress intended the modification procedure to be exclusive, and thus that a state act that purported to allow modification of franchise agreements in a different way would expressly conflict with the Cable Act. The contextual use of "may" in this section of the Cable Act is quite different from its use in the previous section governing renewals. In this case, the Act states that cable operators may obtain modifications if certain conditions are met—"may" is used to demonstrate that the cable operator is able to obtain modifications, *but only if* it follows the procedure outlined in the Act. In contrast,

in the section governing renewals, the Act states that franchising authorities may use the outlined procedures, and does not place any conditions on that permission.

The Michigan Act, by rendering unenforceable all provisions of existing franchise agreements that do not accord with the uniform agreement, purports to modify franchise agreements in a manner not contemplated by the Cable Act. *See* Mich. Comp. Laws § 484.3305(3) ("On the effective date of this act, any provisions of an existing franchise that are inconsistent with or in addition to the provisions of a uniform video service local franchise agreement are unreasonable and unenforceable by the franchising entity."); *see also* H.R. Rep. No. 98–934 at 94, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4731 ("A state may not, with regard to [a requirement on a cable operator], enact a statute which requires compliance prior to the expiration of the current franchise."). Section 3305(3) can be read to mean only that any franchise authorities with agreements containing terms inconsistent with the uniform agreement saw those terms invalidated and replaced by the uniform terms, which certainly would constitute a modification of those agreements. The allegations in the complaint follow that argument: Comcast is no longer providing PEG support and funds that it was required to provide under the 1985 Agreement because it contends that it is no longer obligated to do so as a result of the Michigan Act. Because the Michigan Act purports to modify franchise agreements in a manner at odds with the procedures set out in the Cable Act, the Michigan Act expressly conflicts with the Cable Act on this point. The provision of the Michigan Act invalidating provisions in existing franchises is expressly preempted by the Cable Act.

## B. PEG channels

The City contends that Comcast was required under the terms of the 1985 Agreement to provide an additional PEG channel, and that Comcast is not providing that channel because of the modifications in the agreement as a result of the Michigan Act. The defendants contend that this claim must be dismissed on standing and ripeness grounds. The argument need not detain the Court for long. The City has asserted that it was harmed by the Michigan Act's limiting the number of PEG channels because as a result Comcast has not provided an additional PEG channel as required by the 1985 Agreement. That is sufficient to constitute an actual and concrete injury conferring standing to challenge the Michigan Act on this point, and the controversy is ripe for adjudication. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130.

One aspect of the City's claim here is that the Michigan Act denies it and other local franchising authorities power to *establish* requirements that cable operators must meet. The City argues that the Cable Act grants those powers to it and other local franchising authorities, and thus that the Michigan Act's implementation of uniform requirements on those features conflict with the Cable Act. Comcast counters that states are the ultimate franchising authorities under the Cable Act, and therefore the Michigan Act's determinations as to PEG channel requirements do not conflict with the Cable Act. The defendants have the better argument, inasmuch as the Cable Act purports to establish only minimum—not absolute—requirements for including PEG channel services in franchising agreements. The Cable Act states that "[n]othing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services consistent with this subchapter." 47 U.S.C. § 556(b). That language sug-

gests that states retain the power under the Cable Act to regulate cable franchising by local governments, as long as the states' regulation does not violate any requirements of the Cable Act. The legislative history supports that view:

> The Committee does not intend Title VI to upset the traditional relationship between state and local governments, under which a local government is a political subdivision of the state and derives its authority from the state. A state may, for instance, exercise authority over the whole range of cable activities, such as negotiations with cable operators; consumer protection; construction requirements; . . . and other franchise-related issues—as long as the exercise of that authority is consistent with Title VI. If, under [this Act] or any state law, a requirement imposed upon a cable operator must be reflected in a franchise, *the state may exercise its authority over cable either by establishing a state franchising authority or by placing conditions on a local government's grant of a cable franchise.*

H.R. Rep. No. 98–934 at 94, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4731 (emphasis added). There is no conflict between the Michigan Act and the Cable Act (and therefore no preemption) unless the PEG access requirement in the Michigan Act permits a cable operator to avoid requirements established in the Cable Act. But the City does not assert that the Michigan Act establishes specific requirements for furnishing PEG channels that conflict with requirements in the Cable Act. Therefore, that aspect of the City's preemption claim fails.

The City also asserts that the Michigan Act's provisions governing PEG channel *support* expressly conflict with the Cable Act's requirements on that point because the Michigan law limits franchising authorities' right to enforce PEG requirements contained in existing franchising agreements and prohibits franchising authorities from increasing the number of PEG channels. That is a materially different argument. The Cable Act provides that franchising authorities "may enforce any requirement in any franchise regarding the providing or use of [PEG] channel capacity. Such enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator which relate to public, educational, or governmental use of channel capacity." 47 U.S.C. § 531(c). The Cable Act also states that when awarding a franchise, a franchise authority "may require adequate assurance that the cable operator will provide adequate [PEG] channel capacity, facilities, or financial support." 47 U.S.C. § 541(a)(4)(B). Comcast argues that section 541(a)(4)(B) actually *limits* franchising authorities' enforcement power under section 531(c), because authorities may only enforce demands for "adequate" PEG channel support. It asserts that because the Cable Act does not define "adequate," the state, as the ultimate franchising authority, has the right to determine what constitutes "adequate" support for PEG channels and thus what is enforceable under the Cable Act.

■ Comcast may be correct that the Michigan Act is not preempted with respect to its grant of authority to the state to determine what PEG support may be deemed "adequate." However, the Michigan Act's provisions that curtail a municipality's authority to enforce PEG channel requirements in existing agreements conflicts with the Cable Act. Section 541(a)(4)(B) of the Cable Act allows a franchising authority—which certainly included the City—to include in a franchise agreement "adequate assurance" from the cable operator for support of PEG channels. But once the agreement is in place,

"[a] franchising authority may enforce any requirement in any franchise regarding the providing or use of such channel capacity." 47 U.S.C. § 531(c). The Michigan Act states that any franchise agreement provisions conflicting with the uniform agreement are unenforceable, including provisions regarding PEG channel support. *See* Mich. Comp. Laws § 484.3305(3). The Michigan Act therefore prohibits franchising authorities from enforcing franchise provisions that the Cable Act grants franchising authorities the explicit power to enforce. That conflict invokes the explicit preemption language of the Cable Act, 47 U.S.C. § 556(c) (stating that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority ... which is inconsistent with this chapter shall be deemed to be preempted and superseded"). *See City of Dearborn v. Comcast of Michigan III, Inc.*, No. 08–10156, 2008 WL 4534167 at *5 (E.D. Mich. Oct. 3, 2008, *as amended* Nov. 25, 2008). Other courts have recognized a franchising authority's enforcement power under section 531(c). *See Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 789, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("[§ 531(b)] authorize[s] local franchise authorities to require cable operators to set aside channel capacity for PEG [channel] access when seeking new franchises or renewal of old ones"); *Goldberg v. Cablevision Sys. Corp.*, 261 F.3d 318, 320–21 (2d Cir.2001) (a franchising authority can "enforce any requirement in any franchise [agreement] regarding the providing or use of [PEG] channel capacity") (citation omitted); *Time Warner Ent. Co., L.P.*, 93 F.3d at 972 (franchising authorities may mandate PEG channel access as a franchise condition); *Time Warner Cable of New York City v. City of New York*, 943 F.Supp. 1357, 1367 (S.D.N.Y.1996) ("The [Cable Act gave] ... a franchising authority the power to require an operator to provide PEG channels."). "Because the [Michigan Act] makes unenforceable what federal law explicitly makes enforceable, the [Michigan Act] is preempted by 47 U.S.C. § 531." *City of Dearborn*, 2008 WL 4534167 at *5.

### C. Customer service provisions

For the same reasons, the Michigan Act's restrictions against municipalities from enforcing customer service likely conflict with 47 U.S.C. § 552(a)(1) ("A franchising authority may establish and enforce ... customer service requirements of the cable operator...."). Similarly, the Michigan Act's safe harbor provisions, which provide defenses to claims that a cable operator has violated the Cable Act's prohibition on income discrimination, are problematic. The Cable Act states:

> In awarding a franchise or franchises, a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

47 U.S.C. § 541(a)(3). The legislative history of the Cable Act suggests that Congress intended this provision to require franchise authorities to mandate the wiring of all areas covered by the franchise. H.R. Rep. No. 98–934 at 59, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4696 ("Under this provision, a franchising authority in the franchise process shall require the wiring of all areas of the franchise area to avoid this type of practice [income-based discrimination]."). In contrast, the Michigan Act provides that it shall be a defense to a charge of race- or income-based denial of access (which is prohibited under the Michigan Act, see Mich. Comp. Laws § 484.3309(1)) that:

(a) Within 3 years of the date it began providing video service under this act, at least 25% of households with access to the provider's video service are low-income households.

(b) Within 5 years of the date it began providing video service under this act and from that point forward, at least 30% of the households with access to the provider's video service are low-income households.

Mich. Comp. Laws § 484.3309(2).

■ The plaintiff's argument that the Cable Act requires, or at least permits franchising authorities to require, universal wiring in the franchise area is not compelled by the statutory text. There is nothing in the plain language of the statute to suggest such a requirement; instead, the statute merely requires that a decision not to provide service to an area not be based on the income of the area's residents. A cable operator would be within its rights under the language of the Cable Act to not provide cable service to one part of a franchise area because, for example, the existence of many competing cable services in the area would render the provision of service by a new operator unprofitable. Further, the FCC has rejected the plaintiff's contention that the Cable Act requires universal build-out. *See American Civil Liberties Union v. F.C.C.*, 823 F.2d 1554, 1579–80 (D.C.Cir.1987) (The FCC concluded that "the intent of [the Cable Act's anti-discrimination provision] was to prevent the exclusion of cable service based on income and that this section does not mandate that the franchising authority require the complete wiring of the franchise area in those circumstances where such an exclusion is not based on the income status of the residents of the unwired area.") (quoting 50 Fed.Reg. at 18,647). This aspect of the plaintiff s preemption argument fails.

However, by precluding liability for violations of an anti-discrimination provision in the event that 25 or 30 percent of the households with access to a cable operator's service are low-income, the Michigan Act conflicts with the Cable Act. As the plaintiff points out,

Comcast could actually discriminate against every low income resident in the City, as long as 30% of households anywhere in Michigan with access to its service are "low-income." Mich. Comp. Laws 484.3309(2)(b). This application of a state-wide standard, in place of a franchise-area one, clearly conflicts with the Federal Act's prohibition on income-based discrimination "of the residents of the local area in which such group resides." 47 U.S.C. § 541(a)(3).

Pl.'s Br. in Support of Mot. for Partial Summ. J. at 18. Because the Michigan Act's provision of a defense to a charge of discrimination in a franchise area would actually allow a cable operator to discriminate based on income in violation of the Cable Act, the safe harbor provisions are probably preempted by the Cable Act.

■ But that conflict will does not furnish a basis for relief to the City. Comcast is the incumbent cable operator, and the City has not alleged that Comcast has any obligation to wire additional areas within the service area. Nor has the City alleged that Comcast has failed to abide by the customer service or the anti-discrimination provisions in the 1985 Agreement. Nor has the City alleged that such a breach "is certainly impending." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Peoples Rights Organization Inc.*, 152 F.3d at 527. Therefore, a determination of whether the Michigan Act's customer service and anti-discrimination provisions are preempted by the Cable Act is not necessary to resolve the City's breach of fran-

chise claim, and the claim is not ripe for adjudication. There is no concrete factual context in which the Court can decide the dispute as to those provisions. The City argues that it will suffer hardship if the Court declines to adjudicate these contentions because it would be "powerless" to prevent Comcast from discriminating in the provisions of services. But, as the Sixth Circuit has explained, "'a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Cooley v. Granholm,* 291 F.3d 880, 883–84 (6th Cir.2002) (quoting *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)). The plaintiff's claim is based only on the possibility that Comcast will in the future violate anti-discrimination provisions of the Cable Act. Because build-out has already occurred and the franchise negotiations deal with renewal with the incumbent cable operator, there is little likelihood that violations will take place.

### D. Implied preemption

The City alleges that those provisions of the Michigan Act that are not expressly preempted by the Cable Act are impliedly preempted because they "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Fed. Sav. and Loan Assoc.,* 458 U.S. at 153, 102 S.Ct. 3014. Comcast responds that the Michigan Act promotes the purposes of the Cable Act.

The Cable Act identifies as its goals to:

(1) establish a national policy concerning cable communications;

(2) establish franchise procedures and standards which encourage the growth and development of cable systems and which assure that cable systems are responsive to the needs and interests of the local community;

(3) establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems;

(4) assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public;

(5) establish an orderly process for franchise renewal which protects cable operators against unfair denials of renewal where the operator's past performance and proposal for future performance meet the standards established by this subchapter; and

(6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. § 521. The City contends that the Michigan Act conflicts with the first and second purposes, while the defendants contend that the Michigan Act supports the first, second, and sixth purposes of the Cable Act.

The Sixth Circuit has held that "Congress ... sought in the Cable Act to provide a balance between respecting the needs and interests of communities and protecting cable operators against unreasonable demands." *Union CATV, Inc.,* 107 F.3d at 442. Of course, the City and Comcast represent the two sides of this balancing attempt, and therefore each party asserts that its side of the equation is the more weighty in determining whether the Michigan Act comports with the purposes of the Cable Act. However, Comcast's argument is ultimately more persuasive, as the City's cited cases differ in material ways from the present case, the existence of state-wide franchising procedures does not subvert the Cable Act's goal of creating national standards, municipalities retain a role in the franchising process under the Michigan Act, and many

other states have state-wide franchising procedures and standards.

The City cites *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). In that case, the Supreme Court found that a Massachusetts statute restricting the state's ability to purchase goods or services from companies that did business in Burma was preempted by a federal law placing sanctions on Burma. *Id.* at 366, 120 S.Ct. 2288. However, that case involved foreign policy, an area in which the interest in a uniform national policy is much stronger than in the case of cable regulation. The Supreme Court in that case also put great weight on the executive's authority under the federal act to speak for the United States in the international community; no such consideration exists in this case. *Id.* at 381, 120 S.Ct. 2288. That case does not support the idea that the Michigan Act's provisions directed primarily toward approval of new entrants in the cable market conflicts with the purposes of the Cable Act. In *Qwest Broadband Services, Inc. v. City of Boulder*, 151 F.Supp.2d 1236 (D.Col.2001), also cited by the City, the district court invalidated a local ordinance requiring that franchise agreements be approved by a vote of taxpayers, finding that it conflicted with the goal of promoting competition between cable providers embodied in the Cable Act. *Id.* at 1244. The case does tend to demonstrate that it is possible for the Cable Act to impliedly preempt local and state laws on cable franchising, but the ordinance found to be preempted in *Qwest* bears no similarity to the Michigan Act, and thus the case does not provide support to the City's position.

■ The existence of a state-wide franchising procedure does not necessarily subvert the Cable Act's goal of creating a uniform national policy regarding cable communications. Indeed, the Cable Act explicitly contemplates a role for the state in regulating cable franchising. *See* 47 U.S.C. § 521(3). As Comcast points out, 19 other states have established statewide franchising procedures and standards. That tends to demonstrate that such standards and procedures do not subvert the national policy embodied in the Cable Act as a matter of course. Moreover, the Michigan Act does not entirely erase the role of municipalities in cable franchising. As noted earlier, the Michigan Act provides that local governments and cable operators may enter into voluntary agreements that include conditions from those in the uniform agreement. Mich. Comp. Laws § 484.3313 ("This act does not prohibit a local unit of government and a video service provider from entering into a voluntary franchise agreement that includes terms and conditions different than those required under this act."). Further, the Michigan Act's uniform franchise agreement includes a clause requiring cable operators "to comply with all valid and enforceable local regulations regarding the use and occupation of public rights-of-way in the delivery of the video service, including the police powers of the franchising entity." Mich. Comp. Laws § 484.3302(3)(i). Therefore, although it might be said that the Michigan Act tips the balance implicated in the Cable Act toward the protection of cable companies, it cannot be said that the Michigan Act is an obstacle to achieving the balance sought by Congress in passing the Cable Act where the Michigan Act provides some protection to local interests and regulation.

### E. The 1985 agreement and holdover tenancy

■ It is undisputed that the 1985 franchise agreement expired by its own terms on February 28, 2007. It is also undisputed that Comcast withdrew from negotiations to renew the franchise, and

that the last proposal came from the City, which contained conditions concerning consumer protections, anti-discrimination, and PEG channels. Under the interpretation of the Michigan Act urged by the State and approved herein by the Court, the City timely acted on Comcast's application to renew the franchise and did not approve it. Neither the City nor Comcast has pursued a contested case concerning the renewal, *see* 47 U.S.C. §§ 546, 555, and the parties have not successfully negotiated additional terms on a consensual basis. *See* Mich. Comp. Laws § 484.3313. Because the City responded in a timely manner, no new franchise agreement has taken effect by operation of state law. Therefore, there is no franchise agreement in place that allows Comcast to engage in cable operations in the City of Detroit.

That circumstance, the City insists, renders Comcast a holdover tenant; otherwise, Comcast would be a trespasser and would be in violation of the Cable Act and the Michigan Act, both of which require Comcast to have a franchise with the municipalities where it provides cable service. *See* 47 U.S.C. § 541(b)(1) (stating that "a cable operator may not provide cable service without a franchise"); Mich. Comp. Laws §§ 484.3303(1) (stating that "[b]efore offering video services within the boundaries of a local unit of government the video provider shall enter into or possess a franchise agreement with the local unit of government as required by this act").

The plaintiff cites cases from California and Florida in which courts have found that a cable operator that continues to provide cable services after the expiration of its franchise is in the position of a holdover tenant and is bound by the terms of the expired franchise agreement. *Comcast of Ca. I, Inc. v. City of Walnut Creek,* 371 F.Supp.2d 1147, 1155 (N.D.Cal.2005); *Florida Power Corp. v. City of Winter Park,* 887 So.2d 1237, 1241 (Fla.2004).

The Michigan courts have not yet decided the precise issue of the relationship between a municipality and a cable operator when the franchise agreement has terminated and the cable operator continues to provide cable services in the municipality.

■ However, in determining issues of state law such as this, the Court is bound by the pronouncements of the state's highest court. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). And the Michigan Supreme Court has refused to characterize the relationship between a municipality and a franchisee who continues to operate after the franchise has expired as a holdover tenancy. In *City of Detroit v. Detroit United Ry.,* 172 Mich. 136, 137 N.W. 645 (1912), *aff'd sub nom. Detroit United Ry. v. City of Detroit,* 229 U.S. 39, 33 S.Ct. 697, 57 L.Ed. 1056 (1913), the Michigan Supreme Court held that a railcar company that continued to operate in Detroit after its franchise had expired was not analogous to a tenant who has held over on its lease, as the City had argued. In so holding, the Court stated:

The matter of defining the relations between these parties under the circumstances of this case is not without its difficulties. We think, however, that complainant in stating its contention that the relations in all respects are analogous to the relations between landlords and tenants of real estate under similar circumstances makes an impossible comparison, for the reason that similar circumstances could not arise between an ordinary landlord and tenant. In the instant case the municipality, which has but a circumscribed interest in its streets, has granted the right to defendant to occupy certain portions of its public streets for the purpose of maintaining and operating thereon a street railway, under certain terms and

conditions accepted by it, for a certain length of time, which has expired. This presents a relation which cannot be described as a tenancy. Defendant's rights under the franchises terminated by their express provisions, and, because of the interest of a municipality in and to its streets, no such relation as a tenancy has been created or can exist.

*Id.* at 154–55, 137 N.W. at 653. The Supreme Court concluded instead that "the contractual relations between these parties ended upon the expiration of the franchises, and all rights in the defendant company to occupy the city streets, and maintain and operate a street railway thereon, then terminated, and defendant thereafter became a trespasser." *Id.* at 158, 137 N.W. at 654. That decision has never been overturned, was affirmed by the United States Supreme Court, and was cited by the Michigan Court of Appeals as recently as 2004. *See TCG Detroit v. City of Dearborn,* 261 Mich.App. 69, 87, 680 N.W.2d 24, 35 (2004). The Court must abide by the Michigan Supreme Court's determination of state law on this issue.

In *City of Detroit,* Michigan Supreme Court found that the city could compel the defendant to cease operating in the City and to remove its tracks from the streets. *Detroit United Ry. v. City of Detroit,* 229 U.S. at 43, 33 S.Ct. 697. Based on that precedent, the Court could find that the City may compel Comcast to cease operating within its boundaries. However, in *City of Detroit,* the Supreme Court also based its remedial decision on the fact that the plaintiff was attempting to impose fees unilaterally on the defendant in excess of those contemplated in the original franchise agreement. *City of Detroit,* 172 Mich., at 158–59, 137 N.W. at 654. It is not clear how the Court would have ruled had the plaintiff merely attempted to enforce the original terms of the agreement.

 The City argues that because Comcast has continued to operate in the City without an agreement, it has enjoyed a windfall and been unjustly enriched to the detriment of the City. Therefore, the City contends, the Court could imply a contract at law to avoid an inequitable result. Under Michigan law as described by the Michigan Supreme Court, a court may imply a contract at law where the plaintiff can show that the defendant has received a benefit from the plaintiff and it would be unjust to allow the defendant to retain that benefit. *Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools,* 443 Mich. 176, 185, 504 N.W.2d 635, 640 (1993).

Neither defendant has addressed the City's remedial arguments, and the Court believes that additional briefing would assist in the determination of an appropriate remedy. Therefore, the Court will direct the parties to file briefs addressing that issue.

### IV. Conclusion

The Court finds that it does not have subject matter jurisdiction to adjudicate the City's claims that the customer service, anti-discrimination, universal build-out, and safe harbor provisions of the Michigan Act are preempted by federal law because of lack of standing and ripeness. The Court does have jurisdiction to decide whether the renewal and modification procedures in the Michigan Act are preempted, and whether the Michigan Act can curtail the enforcement of existing PEG requirements in the franchise agreement. The Court finds that although the Michigan Act's renewal provisions are not preempted by the Cable Act, the provisions that purport to modify existing franchise agreements by operation of law to curtail a municipality's authority to enforce PEG channel requirements in existing agreements are expressly preempted by

the Cable Act. The Court also finds that the Michigan Act does not prevent municipalities from refusing to approve franchise renewal proposals from cable operators as long as the municipality acts on the proposal within the 30–day limit set forth in the Act. The Court determines that the undisputed facts establish that the City timely rejected Comcast's renewal proposal by proposing allowable additional conditions, and because Comcast thereafter withdrew from negotiations, no new franchise agreement was established. Because Michigan law will not permit Comcast to be treated as a holdover tenant, Comcast must be considered a trespasser.

Accordingly, it is **ORDERED** that the motions for partial summary judgment filed by the plaintiff, defendant Comcast, and intervening defendant State of Michigan [dkt. # 41, 59, 63] are **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that Comcast is found to be a trespasser in the public spaces and rights-of-way within the City of Detroit in which it has placed its facilities and equipment.

It is further **ORDERED** that the parties must file briefs addressing an appropriate remedy for the trespass and failure to renew the franchise agreement for provision of cable services **on or before July 31, 2012.** Briefs must conform to E.D. Mich. LR 7.1(d) and may not may not exceed (10) ten pages.